# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

---

## No. 22-1688

## CALISIA KELLEY AND JOHNNIE MAE KELLEY, CO-ADMINISTRATRIXS OF THE ESTATE OF BRUCE KELLEY, JR.,

**deceased,**

**Appellants,**

**vs.**

## BRIAN O'MALLEY, DOMINIC RIVOTTI in their Individual Capacities as Police Officers for the Allegheny County Port Authority,

**Appellees,**

---

**Appeal from the Memorandum Opinion and Order dated March 18, 2022 in the United States District Court for the Western District of Pennsylvania at Docket No. 2:17-cv-1599 granting the Appellees' Summary Judgment Motion.**

---

**APPELLANTS' PRINCIPAL BRIEF and VOLUME I of APPENDIX.**

---

**Submitted by:**

**Noah Geary, Esquire**

**Attorney for Appellants**

**123 Washington Street**

**Washington, PA 15301**

**724-222-3788**

**PA ID 78382**

## TABLE OF CONTENTS: APPELLANTS' PRINCIPAL BRIEF.

Table of Contents…………………………………………………..    2

Table of Authorities……………………………………………    3

Statement of subject matter and appellate
jurisdiction…………………………………………………..    4

Statement of the Issues presented for review……………………………    5

Preservation of Issues……………………………………………    6

Concise Statement of the Case……………………………………    7

Related cases and proceedings…………………………………..    59

Standard of Review…………………………………………….    60

Summary of Argument……………………………………………    61

Argument……………………………………………………    62

Conclusion……………………………………………………    61

Certificate of Compliance………………………………………..    80

Certificate of Service……………………………………………    81

## TABLE OF AUTHORITIES:

**<u>Cases:</u>**

<u>Abraham vs. Raso,</u> 183 F.3d 279, 294 (3rd Cir. 1999)…………………    64

<u>Anderson vs. Creighton,</u> 483 U.S. 635, 640………………………………    63

<u>Brosseau vs. Haugen,</u> 543 U.S 194 (2004)………………………………    67

<u>Graham vs. O'Connor,</u> 490 U.S. 386 (1989)……………………………..    71

<u>Hayes vs. Easterday,</u> 879 F. Supp.2d 449 (E.D. Pa. 2012)……………    76

<u>James vs. Duquesne University,</u> 936 F.Supp. 2d 618 (W.D. Pa. 2013)……..  76

<u>Kisela vs. Hughes,</u> U.S.  (2018)…………………………………………    79

<u>Lamont vs. New Jersey,</u> 637 F.3d 177, 183 (3rd Cir. 2011)…………….    63

<u>Russell vs. Richardson,</u> 905 F.3d 239 (3rd Cir. 2018)………………….    71

<u>Saucier vs. Katz,</u> 533 U.S. 194, 201-202 (2001)……………………….    63

<u>Tennessee vs. Garner,</u> 417 U.S. 1 (1985)………………………………    63

<u>Tolan vs. Cotton,</u> 134 S.Ct. 1861 (2014)………………………………    67

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION:

This Court has Subject Matter Jurisdiction over this appeal pursuant to **Title 28 Section 1331**, because the cause of action, deprivation of Bruce Kelley Jr.'s 4th Amendment right to be free from an illegal seizure, i.e., being killed by deadly force, was violated. Because a constitutional right was violated, a federal question is involved.

This Court has appellate jurisdiction over this appeal pursuant to **Title 28 U.S.C. Section 1291** because the District Court's granting of the Appellees' Rule 56 Summary Judgment Motion is an appealable Final Order.

A Notice of Appeal was filed on April 13, 2022 which was timely because it was filed within 30 days of the date of the March 18, 2022 Order granting the Appellees' Motion for Summary Judgment.

## STATEMENT OF ISSUES:

1.      Did the lower Court err in granting Summary Judgment for the Defendant Officers by granting them qualified immunity in this deadly force case?

**ANSWER:  YES.**

2.      In so doing, did the lower Court err by concluding that no genuine issue of material fact existed as to whether Kelley made movements towards the Officers as he was being attacked by the Officers' K-9?

**ANSWER: YES.**

3.      In so doing, did the lower Court err by concluding that no genuine issue of material fact existed as to the distance between Kelley and the Officers when they started shooting him while he was in the midst of fighting off the 124 pound German Shephard?

**ANSWER: YES.**

4.      Did the lower Court also overlook/misapprehend other material facts of record?

**ANSWER:  YES.**

5.      Was Kelley's constitutional right to be free from being shot to death while he fought off the K-9 clearly-established such that the Officers knew that they were violating his right to be free from deadly force? In other words, is this an obvious case under <u>Tennessee vs. Garner</u> and <u>Graham vs. O'Connor</u>?

**ANSWER: YES.**

## PRESERVATION OF ISSUES:

All issues raised herein were preserved in the Court below in the filings opposing Appellees' Summary Judgment Motion.

## CONCISE STATEMENT OF THE CASE:

<u>Facts[1]</u>:

The Appellants' deceased, Bruce Kelley, Jr., age 37, was with his father, Bruce Kelley, Sr. in the Borough of Wilkensburg on the day of his Homicide. Kelley was lawfully spending time with his father in a gazebo. They were drinking beer. Two Allegheny County Port Authority police officers were about to approach Kelley and his father. Kelley, Jr. attempted to de-escalate any situation by getting up and walking towards a garbage can and throwing his beer away. (*JA, 565, 2nd Paragraph, 2nd to last sentence*). *(Report 2nd to last sentence, Paragraph 2, page 1 of 2)*.

Officers Adams and Hampy nevertheless approached the Kelleys. Adams and Hampy contend that they saw "suspicious individuals" on the nearby Linear Trail. They could provide any physical description of the suspicious individuals. They could not provide any description of clothing worn. They could not identify the race of the suspicious individuals. They could not identify the gender of the individuals. Nor could Adams and Hampy articulate any conduct or behavior that was "suspicious". It is the position of the Appellants in this case that the alleged observation of the "suspicious individuals" was pretext to try to justify Adams and

---

[1] Because the situation involved in this case and surrounding circumstances are very fact intensive, the Fact Section is necessarily lengthy.

Hampy's approach of the Kelleys in the Gazebo. *(JA 441-442; L23 - p.13 line 17; lines 13-25).* Adams contends that at the gazebo Kelley "attempted" to "push past" Adams in an attempt to walk away from Adams. Simultaneously, Kelley Sr. interacted with Hampy. As Adams assisted Hampy with Kelley Sr., Kelley, Jr. began "hugging the gazebo." (*JA, 449-450).* Adams and Hampy began to strike Kelley's hands so that he would let go of the Gazebo. They did this repeatedly. In response, Kelley pulled out a utility knife.  It was described by Officer Kaupinis as having a 6 inch handle and a blade coming out an inch or two. *(JA, 462, lines 5-14).* The reason Kelley was in possession of the utility knife is because he was homeless at the time. The utility knife was for his self-protection. Kelley walked away from the 2 patrol officers.

Adams called for back–up via Radio and numerous police officers immediately responded. This included the Appellees, O'Malley and Ravotti. The content of the call was that there was a group consuming alcohol in the gazebo who began resisting. There is no mention by Adams in his Radio Transmissions that Kelley either brandished or gestured with the utility knife at the Gazebo. The content of Adams' call was merely that Kelley "had a knife". There is no mention in Adams' Radio Communications of any aggravated assault – a Felony[2] - on him

---

[2] Pertinent to this Court's deadly force "reasonableness" analysis, Kelley was therefore not a "fleeing felon". An Open Container violation is a mere Summary Offense in Pennsylvania. Resisting arrest is a misdemeanor.

or Hampy. *(JA, 459, 460, 463, 485).* Kelley, with the knife out, started to walk

away from all of the officers. Kelley continued walking away from the officers for

the next 18 minutes.

<u>No radio transmissions exist that Kelley threatened officers with the utility knife or</u>

<u>made slashing gestures with the utility knife at any time during the 20 minute</u>

<u>episode before he was shot to death.</u>

Radio transmissions by and between all of the responding officers as to what

occurred during this 18-20 minute episode were memorialized in the Appellees' 18

Page "Timeline of Events" *(JA, 1317-1334).* No radio transmissions exist that

Kelley made "slashing gestures" with the knife at any time during the 20 minute

episode. No radio communications exist that Kelley threatened to assault any

Officer or gestured with the knife other than on one momentary occasion involving

Officer Saunders, which is addressed later in this fact section.

<u>Kelley avoided officers during the twenty (20) minutes leading up to Officers</u>

<u>O'Malley and Ravotti shooting Kelley to death.</u>

A.    He continued to walk towards me. And then he made a left-hand turn,
      from his angle, down towards the fence line.

      .                        .                        .

Q.    How many feet away from you was he when he makes the left-hand
      turn to go through the hole in the fence?

A.    I'd say 15 to 20 feet away.

*(JA, 956 lines 1-4; 464 lines 8-24; 960, lines 1-6).*

Q.    Did he ever walk towards you and try to initiate a physical conflict?

A.    He was coming at me with the knife, but he turned both times.

Q.    And he turned away from you?

A.    He turned to the side. He didn't turn around and retreat. He just turned away, to the side of me.

Q.    So that he was no longer proceeding in your direction?

A.    Exactly.

*(JA,  page 1123,  lines 9-20).*

<u>Kelley avoided civilians at all times also.</u>

Q.    Did the actor- did you hear him say anything to those kids?

A.    No, sir.

Q.    Did you see him gesture in any way to those kids?

A.    No, sir.

Q.    And then you say -did you say he- he turned off in another

direction?

A.    Yeah.

*(JA,  1116, lines 13-20).*

.                    .                    .

A.    There was a lady yelling on her front porch to tell him to drop

the knife. He walked right by her. I remember that.

Q.    When you say "He walked right by her", where was she and

where was he?

A.    He was walking through her yard.

Q.    And where was she?

A.    There was one lady on her porch yelling at him. I remember

another lady up in the second floor screaming at him to drop the

knife. That was all like – they might have even been neighbors.

Q.    Did he say anything to these women?

A.    Not to my knowledge.

Q.    Did he make any movements or motions as if he was going to

walk towards them?

A.    He was walking toward them. He walked up the front sidewalk

of the one lady's residence, but he continued down the side of

the house.

Q.    Did he verbally threaten either of those women?

A.    Not to my knowledge, no.

Q.    Did he, say, gesture with his knife towards those – either of

those two women?

A.    I did not witness it, no.

*(JA, 1229- 1230,  page 14 line 5 – page 15 line 3).*

Kelley made no threats of violence to officers or civilians.

Q.    Did he at any point in time –at that juncture, did he threaten you

verbally with violence?

A.    No.

Q.    Did he make any movements towards you? Instead of making a left to

go through the hole in the fence, did he start coming towards you?

Make any movements actually towards you?

A.    He was walking towards me, then made the left.

*(JA, 976, lines 18-24).*

Q.    And he didn't take the knife and swing it at you or anything like that?

A.    No.

*(JA, 978, lines 2-4).*

<u>Officers testified that uses of force deployed upon Kelley did not provoke violence
or aggression from him.</u>

Officer Hampy said that OC Spray was deployed on Kelley. He wiped it off

and walked away. *(JA 566; p. 2 of 2, first full paragraph).*

Officer Kaupinis deployed OC spray. Kelley just continued walking away

from the officers. *(JA 731; lines 1-6).*

Defendant Ravotti admitted that Kelley would respond with an insult/ profanity - yet would simply continue walking away from the Officers after they would deploy force to him. *(JA 374; lines 12-23)*.

Officer Granger deployed a Taser on Kelley. Kelley responded with profanity and kept walking away from Granger. *(JA, 1160; lines 10-14)*.

<u>Kelley's momentary interaction with Officer Saunders.</u>

In the entire 20 minute episode before the Appellees shot Kelley to death, Kelley turned towards Officer Saunders, raised and pointed his knife momentarily towards Sanders when Saunders made an attempt to deploy his ASP/baton.

Kelley said to Sanders: "Don't you do it!!!  Don't you sneak up on me!". (*JA 1040; lines 8-12*). Kelley immediately then continued walking away from all of the Officers. There were at least 10 officers on Scene pointing their loaded guns at Kelley at that point in time. (*JA 965; line 25;* see also Video Surveillance footage).

Twenty-two (22) Officers responded in total, and were following Kelley during the episode.

<u>Kelley had mental illness.</u>

Kelley had been diagnosed since he was young with Paranoid Schizophrenia. He was also diagnosed secondarily with Bi-Polar Disorder. (*JA 184-186; Mental Health Records of Kelley*).

<u>Kelley exhibited signs of mental illness throughout the episode.</u>

Officer Hahn testified that it was obvious that Kelley had some type of mental illness:

> Q.    You said at some point you almost ran into him or something like this.
>
> A.    Yes. At one point in time, I knew we were having an issue or whatever issue with – you know –whether it was a psychological issue or whatever issue he may be having, because he just didn't – he just wasn't responding to any commands.
>
> *(JA 1230; 4-9).*

.                           .                           .

Q.    Well, you mentioned something about consideration was –

something about whether he had a psychological issue. So what

was your thinking along those lines?

A.    That was – that was my personal thoughts. Because he just

wasn't responding to anything we were saying. Multiple

officers were giving him  a hundred commands to drop the

knife, and he just – he didn't respond to anything.

*(JA 1232; lines – 3-10).*

Additionally, primary shooter O'Malley heard Kelley, Jr. say: "Go ahead.

Fucking shoot me. Fucking shoot me." (*JA 257, lines 6-14; 259, lines 14-17*).

When asked if he took that as an indication that Kelley had mental health issues,

O'Malley replied:

A.    No.

When asked why not, O'Malley answered:

A.    No reason.

*(JA 305, 306; line 24 - 6).*

The Allegheny County Medical Examiner Death Investigation Case Report stated:

"Past Medical History: possible psych issues"

This information would have been obtained from the Officers at the scene by the Mobile Crime Unit Personnel. Thus, Officers stated to the MCU personnel at the scene that Kelley showed signs of possible psychiatric/psychological issues during the episode.

*(JA 601, page 2).*

<u>Contrary to their Use of Force training, neither O'Malley nor Ravotti attempted to de-escalate the situation.</u>

O'Malley admitted that he did nothing to de-escalate the situation. (*JA 290, lines 21-23*). O'Malley was determined to deploy his K-9 Partner regardless of the circumstances:

**"I'm going to go get my K-9.**

**This is going to be a K-9 call".**

*(JA 487, lines 5-7).*

Not only was O'Malley committed to deploying his K-9 Partner, O'Malley was not

interested in attempting any lesser uses of force:

> Q.    Before you deployed Aren, was there any thinking
> by you to somehow get behind Bruce Kelley, Jr.,
> physically to –you get behind him and – and
> try to apprehend him some way from behind?

> A.    **No. I was committed to K-9 deployment.**

> *(JA 305; lines 3-7).*

Ravotti likewise did not attempt to de-escalate the situation. Instead, Ravotti

demonstrated a predisposition to use deadly force. Ravotti stated to Kelley:

> "You need to have to drop the knife or
> we're going to have to shoot you."

> *(JA 384, 385; lines 2-8 and lines 4-6).*

## At the point in time O'Malley and Ravotti shot Kelley to death, Kelley was cornered in front of a house on Whitney Avenue.

At the point in time O'Malley and Ravotti shot Kelley to death, Kelley was cornered in front of a house on Whitney Avenue. All of the Officers who responded to this incident were situated in front of the house with Kelley's back to the house. Kelley was surrounded and cornered by the officers.  *(JA 998; L1-22; JA 300; lines 6-8).*

### O'Malley's deployment of his K-9 Partner on Kelley.

The moment O'Malley deployed his K-9 partner, Kelley was walking away from all officers. Kelley's back was to all of the officers. No civilians were in the area.

*(JA 396, 400; line 5 into next page line 4; ALSO, line 23).*

The dog, "Aren", was a full German Shephard. *(JA 203).* Aren weighed 124 pounds (JA 1606). Kelley weighed 213 lbs. *(JA 1606).* O'Malley intentionally concealed himself and his K-9 partner from Kelley behind bushes. *(JA 494, lines 2-14).* This is despite the fact that O'Malley's experience as a K-9 Officer  taught

him that a suspect may surrender merely upon seeing the 124 pound German Shephard. *(JA 231, lines 1-7)*.

At the same point in time that Defendant O'Malley was allegedly giving commands to Kelley that O'Malley was going to deploy the dog on Kelley, other Officers were shouting at Kelley to drop the knife. (*JA 996, lines 2-23*).

Kelley stated that he would kill the dog if the dog was deployed. O'Malley heard Kelley say that Kelley would kill the dog if it was deployed on Kelley. *(JA 273-274)*.

### **The use of deadly force.**

Kelley defended himself against the 124 pound German Shephard attack dog with his utility knife. Kelley was fully engaged with the dog. The dog, despite being slashed/stabbed by Kelley, continued attacking Kelley. The dog made a second attempt at Kelley, jumping up at Kelley, directly to Kelley's chest area. O'Malley and Ravotti started shooting Kelley.

O'Malley fired nine shots at Kelley. O'Malley claims that he fired all nine shots "within a second". He claimed there was no delay between any of the shots. *(JA 286, lines 15-19; 311, lines 14-25)*. Ravotti fired two shots *(JA, 529 line 8)*.

Significantly, the Appellees shot Kelley directly in the back, twice:

<u>Location of entrance wound #1</u>: in the back: right upper back

Direction: back to front and downward

<u>Location of entrance wound #2</u>: in the back: right mid back

Direction: back to front, right to left and upwards.

They shot Kelley 7 additional times: in the chest 2 times, in the neck once, in the flank once, and in the forearm.

*(JA 35-37).*

Neither Officer has any explanation as to:

(1)    who shot Kelley in the back, OR

(2)    how the shooting of Kelley in the back – twice – occurred:

<u>O'Malley:</u>    Q.    Now, when you were firing at Kelley, he was facing you, correct?

A.    Yes.

Q.      Okay. Who shot him in the back twice?

A.      I don't know.

Q.      Are the only two options you or Officer Ravotti?

A.      Yes.

Q.      Was it Ravotti?

MR. EVASHAVIK:      I'm going to object to the form of the

Question. It's a lack of foundation. Go ahead. You can answer

whatever you know.

THE WITNESS:      I can't answer that. I don't know.


Ravotti:

Q.      Now, the Autopsy Report of [Kelley] indicates that he was
shot in the back twice. How would that have happened?

A.      I cannot tell you that.

*(JA 415, lines 1-5; 301, lines 2-13).*

<u>Officer Hahn's eyewitness account of the shooting of Kelley.</u>

Q.    Okay. So when you come between the two houses, you see the actor, you see O'Malley. Correct?

A.    Correct.

.                         .                    .

Q.    So O'Malley is in front of you in your field of vision. Is that correct?

A.    Yes.

Q.    And let's say – just using a clock, like, is he at 10 o'clock, noon, or 2?

A.    If he would have been – I was coming out between the houses, and he was probably near 1 o'clock. I don't remember how far. I don't remember if he was on the other side of the street or on my side of the street. **I just heard the gunfire, and I saw the guy with the – the bad guy with the dog in the air.**

Q.    Did you see O'Malley release the dog?

A.    I did not.

Q.    Okay. So the first time you see the dog, where is the dog?

A.    He's – the subject had him and was stabbing him.

Q.    And where was the subject?

A.    He was in the front yard of Whitney Avenue, as you described. It was right in the front yard, near the sidewalk, between the porch and the sidewalk.

.                    .                    .

Q.    Okay.  How was the actor's body positioned from your point of view when you see him with the dog?

A.    If I remember it, like, he was stabbing the dog like this.

Q.    Okay.

A.    Maybe an upward or something like this.

Q.    Was the actor facing you?

A.    I believe so.

Q.    Okay. And, again, I'm not trying to – yeah. I'm not trying to --

A.    I don't want to – I don't want to speculate. But, yeah, he was facing my direction. What I recall, yeah.

Q.    Okay. I'm not trying to trick you. I don't know if he was facing

       you, to the side, whatever it is.

A.    I'm just giving you my best recollection.

Q.    And what do you then observe in the way of shots being fired?

A.    I just heard a real quick few shots go off—maybe four or five or

       six – and the subject drop. That's when I ran over with another

       officer.

       .                         .                        .

A.    Okay. For the – for court reporter, I will be describing. The

       subject would be standing up and either right or left hand –

       either had ahold of the dog or possibly the dog had ahold of him

       as well. And I say some type of stabbing motion.

Q.    And you're making an upper-cut motion?

A.    I – I don't have firsthand knowledge exactly where the dog was

       stabbed. I thought it was up the throat, but that's just the way I

       remember it. And then – that's when the gunshots occurred.

                                           *(JA,  1239 -1242).*

<u>Officer Granger's eyewitness account of the shooting of Kelley.</u>

Q.     Okay. And just so the record's clear, Officer Granger described that Bruce had the knife in his hand such that the blade would be coming out the opposite side of the hand from the thumb?

A.     Correct.

Q.     And --

A.     He held the knife, okay, on the opposite side of his thumb, and the knife was raised towards like the right side of his chest as he watched the dog approach and --

     .                    .                  .

Q.     Was the dog wounded or could you tell yet whether the dog was wounded?

A.     Not yet because we're still focused on, you know --

Q.     On Kelley?

A.     On Kelley, yeah.

Q.     So you heard a yipe, but you don't know if the dog is –you can't physically tell that the dog's wounded yet?

A.      Right, correct.

Q.      Okay. Let's get back then to Kelley, what does any Officer do next?

A.      As far as O'Malley and Officer Ravotti, fire upon Kelley.

Q.      And again, just for the moment, I'm focusing on before the shots are fired, so you see the dog get stabbed?

A.      Correct.

Q.      And the dog comes back to O'Malley?

A.      Again, that was after everything was said and done. Everything was pretty much – **when the dog was stabbed, shots were fired**. It happened very quickly. I mean I'm still focused on Kelley.

Q.      How much time elapsed – I know you're not thinking of it in that moment but looking back, in between the dog gets stabbed and the first shot is fired?

A.      Seconds.

Q.      And do you know who fired first?

A.      I do not.

*(JA, 1180, 1184 - 1189).*

<u>Officer Kaupinis's eyewitness account of the shooting of Kelley.</u>

Q.     Okay. Now where is Bruce Kelley right before O'Malley has the dog and starts issuing commands to Kelley?

A.     He is on the sidewalk, still walking to the busway.

Q.     Okay. And how far away, in feet, is O'Malley from Kelley?

A.     I can't say.

Q.     Can you give me an estimate?

A.     I would estimate 35 feet.

Q.     And you said O'Malley, he was in the street?

A.     Yes.

Q.     And Kelley is at that point walking on the sidewalk?

A.     Yes.

                 .                          .                          .

And then – so when O'Malley is issuing commands to Bruce Kelley, what was he saying?

A.     "Stop. Police. Drop the weapon or I'll release the K-9."

             .                     .                 .

Q.     Were other officers shouting commands at Kelley?

A.     Yes.

Q.     Were you shouting or giving verbal commands to Kelley as well?

A.     I was still yelling at him to drop the weapon.

Q.     And were other officers besides you and O'Malley doing the same?

A.     Yes.

Q.     And tell me what Kelley does after – at some point, he's walking along the sidewalk. Where does he go?

A.     When O'Malley starts giving the commands to stop or he'll release the dog, Kelley turns towards the house that was directly in front of – I'm sorry – directly to his left and walked into that front yard.

Q.     Okay. Were there any civilians in that yard?

A.     No.

Q.     Were there any civilians in the yard next to Kelley?

A.     No.

Q.     Now, at that point in time, are all the officers who responded to this – to your knowledge, are they in the front of the house?

A.     Yes.

Q.     Okay. Are there any officers in the back of the house?

A.     Not that I'm aware of.

Q.     And so Bruce Kelley, he has his back to O'Malley, and he's walking towards that house. Is that correct?

A.     Yes.

Q.      And then what happens?

A.     Officer O'Malley then released K-9 Aren.  K-9 Aren then went towards Kelley.

Q.     Thank you.  What -- what do you see the dog do?

A.     Aren had bit Bruce Kelley, Jr., on his left arm.

Q.     Now, was Kelley still holding the knife at that point?

A.     Yes.

Q.    Now, as the dog is going towards Bruce Kelley, was

Bruce Kelley's back still to the dog?

A.    Yes.

Q.    And please tell me as precisely as you can what you

see the dog did.  Does he bite the back of the arm or the front

of the arm?

A.    He bites the back of the arm.  I believe it was

between -- right around the elbow.

Q.    And when he bites that, the way Kelley's body is

positioned, was his body still positioned with his back to

O'Malley and the dog?

A.    As Aren got on the bite, it pulled Kelley down

slightly to his left.  That's when Kelley, Jr., turned around

and stabbed Aren multiple times at that point.

Q.    And you saw Kelley stab Aren multiple times?

A.    Yes.

Q.   Where on Aren's body?

A.   The head and face area.

Q.   And I'll just read from your report, and I have a
couple questions off of it.  "At this time, Sergeant O'Malley
sent K-9 Aren in for an apprehension.  As K-9 Aren made contact
with Kelley, Jr., he turned and stabbed K-9 Aren with a
cross-body motion with his right hand.  K-9 Aren disengaged,
then re-engaged for a second time."

So can you just explain that, about he engaged
Kelley, then re-engaged?  Just what you saw.

A.   Engaged is when Aren first made contact with Kelley.
He bit him on the arm.  That's when Bruce Kelley turned and
stabbed him multiple times.  Aren came off the bite and then
went back onto a bite and was stabbed again.

Q.   And when Aren goes back onto the bite, is Aren,
like, jumping upwards or on his hind legs?

A.   No.  He had bit him on the arm.

Q.   And so for Kelley to have stabbed Aren multiple

times, there would have been multiple -- would there have been

multiple motions with Kelley's arm?

A.   Yes.

Q.   Is it fair to say there would be, say, one motion

for each stab?

A.   Yeah.  That makes sense.

Q.   What does the dog then do?

A.   After stabbed, the dog released, went back on, was

stabbed again.  Then released and ran away.

Q.   Okay.  And then what do you see happen?

A.   That's when Bruce Kelley, Jr., then turned, held his

knife up towards officers and started making forward motions

towards Officer O'Malley.

Q.   Okay.  So your report says "Immediately after Kelly,

Jr., stabbed K-9 Aren, he turned to face officers and made

motions toward officers on scene."  Is that what your report

said?

A.   Yes.

Q.   Okay.  And, then, now you're testifying he made

forward motions toward officers on scene.  Is that your

testimony now?

A.   Yes.

MR. EVASHAVIK:  Object to the form of the question.

BY MR. GEARY:

Q.   Okay.  So in your report "he turned to face officers

and made motions toward officers on scene."  How was his body

positioned, Kelley, before he turned to face the officers?

A.   That's -- when he was with the dog on him?

Q.   Yeah.  After he stabbed -- after he stabs the dog,

how is Kelley's body positioned?

A.   He had turned back around towards officers at that

point.

Q.   Okay.  And in your report, it says "he turned to

face officers and made motions toward officers on scene."  So

describe, please, what motions he made.

A.   That was raising the knife up and walking towards

Sergeant O'Malley.

Q.   Okay.  Do you admit there's no reference in your

report here that he starts walking toward O'Malley?

MR. EVASHAVIK:  Object to the form of the question.

THE WITNESS:  That's how I -- I wrote the motion

being, as him motioning towards O'Malley.

BY MR. GEARY:

Q.   Right.  There's no mention in your report about

Kelley walking towards O'Malley.  Is that true?

A.   That is not in the report.  Correct.

Q.    Why would that -- I mean, wouldn't that be a

significant fact?  If he is actually walking towards O'Malley,

would that be a significant fact that you would want to include

in your report?

MR. EVASHAVIK:  Object to the form of the question.

It says the same thing in different words in the report.

MR. GEARY:  That's -- that's argumentative.

BY MR. GEARY:

Q.    Sir, would that be a significant fact?  If Bruce

Kelley, Jr., actually started walking towards O'Malley, is that

something that you would have included in your report?

A.    Yes.

Q.    Okay.  And in the last four years, you've had the

opportunity to file an amended report to include this testimony

of this morning where Kelley was walking towards O'Malley.  You

could have filed an amended report to include that.  True?

A.   True.

Q.   And you did not do so?

A.   Correct.

Q.   How many feet would you estimate O'Malley was from Kelley when he releases the dog?

A.   Within 15 to 20 feet.

Q.   Okay.  And now you're claiming that Kelley started walking towards O'Malley.  So how many steps did he take towards O'Malley?

A.   Several.

Q.   Okay.  I mean, how many is several?

A.   Five.

Q.   He took five steps towards O'Malley.  And what was he doing and saying as he takes five steps towards O'Malley?

A.   I don't recall what he was saying, but he was holding the knife up and out towards O'Malley.

*(JA 996 - 1005).*

## Distance.

Ravotti, as to the distance between Kelley and O'Malley when O'Malley deployed his K-9 partner, stated that Kelley was almost on the stoop of the house on Whitney Street.                    *(JA 527, lines 15-25).*

Kaupinis state that O'Malley was "in the street, Whitney Avenue". Kaupinis estimated that O'Malley was 35 feet from Kelley. Kaupinis testified that O'Malley was in the street, Kelley on the sidewalk.                    *(JA 996)*

## Movements by Kelley.

The conclusion of Allegheny County Homicide Detective Caruso was as follows:

"The actor stabbed the canine prompting officers to open fire on the actor".

No movements by Kelley towards O'Malley were documented by this Homicide Investigator.                    *(JA  594).*

The Allegheny Office of Medical Examiner Crime Unit, who assisted in the investigation, concluded:

> "The victim stabbed the Police dog. Officers subsequently opened fire on the victim."

OME Mobile Crime Unit Fact *Sheet  (JA 597).*

This corroborates the Defendants' Initial Interviews with the ACPD where there is no mention  of Kelley, Jr. taking any steps toward O'Malley or any other Officer.

These Reports were composed by Homicide Detectives. There was no question that this was a Homicide. The issue was whether any facts existed which pertained to justification. These Homicide Detectives knew the significance of whether or not Kelley took any steps towards O'Malley or Ravotti.

Identically, there is no mention whatsoever in the Findings of the OME's Mobile Crime Unit, Exhibit 27, that Kelley took any steps toward O'Malley or any other Officer before he was shot:

> "The victim stabbed the Police dog. Officers subsequently opened fire on the victim."

<u>Both O'Malley and Ravotti, in violation of Department Policy, failed to compose required Use of Force Reports, K-9 Deployment Report, and usual Incident Reports.</u>

Officer O'Malley violated Policy by failing to make the usual (1) Incident Report for this incident, a (2) Weapon Discharge Report, and (3) failed to complete a K-9 Usage Report (*JA 297 lines 110-113; JA 173; JA 180, top of page*). O'Malley's excuse for violating Policy was that he was "interviewed" by Homicide Detectives regarding the incident. O'Malley admitted, however, that nothing in the Policy stated that his giving an Interview to homicide detectives was a substitute for creating these Reports. *(JA 298  lines 9-15).*

O'Malley did claim that despite being an Officer for 19 years, he did not know what a "Weapons Discharge Report" was. *(JA 299 lines 11-19).*

Ravotti also admitted that he did not fill out the required Use of Force Report nor the usual Incident Report.  He claimed to not know (i) what these Reports were; nor (ii) where they were kept.   *(JA, 356 lines 13-20 and JA 387 line 14 – 392 line 21).*

<u>O'Malley and Ravotti refused to answer critical questions at their depositions as to where they were and where Kelley was at the 2 critical junctures: upon the deployment of the K-9, and when they began shooting Kelley.</u>

Defendant O'Malley continuously refused to mark on his own Exhibit where he was and where Kelley was at the critical point in time when O'Malley deployed his partner (*JA 263*).

Defense Counsel objected to the authenticity of his own Exhibit:  the color copy of the aerial view of Whitney Avenue depicting the street, the houses, and the yard where Kelley was killed. *(JA 264, 1332).*

O'Malley also continuously refused to mark on his own Exhibit where he was when he started firing at Kelley, Jr. (*JA 267, 272, 283, 284, 285, 286*).

Defense Counsel objected to the question asking O'Malley to mark on his own Exhibit where O'Malley was when he started shooting Kelley because O'Malley wasn't "comfortable" doing so. (*JA: same as above*).

<u>O'Malley and Ravottis' varying descriptions of the shootings.</u>

O'Malley's initial description did **not** state that Kelley took **any steps toward O'Malley** before O'Malley started shooting Kelley. Kelley was fully engaged with defending himself from the K-9 dog and merely **"spun"** towards O'Malley and Rivotti when O'Malley starting shooting Kelley. *(JA 498, lines 1-14).*

"And the dude just kept walking. And that's when I un-unleashed Aren.

I heard him shout –he –he said "I'll fucking kill that fucking dog". But he was still walking. He goes, "I'll kill that fucking dog".

Which I was kind of glad because I knew he didn't – he was walking and saying it, but he didn't, like, see which directed my partner was coming from. That's where I kind of felt I sort of had an advantage to do a --- a nice takedown because he was going to be surprised when the apprehension came in. So he didn't have any reaction time coming.

And I remember him saying it, but I was –I'm like, 'I'm still good because he's kind of still walking.' So then Aren goes –

So kind of –just as the guy sort of gets across the street, that's when Aren

engaged him on his – I think his right – or I'm sorry, his left tricep area. And the

guy sort of, like, took, like two steps forward. And then I could see – I could see a

knife in his right hand. And then that's when he spun.  And he spun, like,

backwards – no, he spun around. And as he's spinning, I'm seeing him. He's kind

of like doing, like, a thrusting. I could see that he's – you know where the knife is

going into Aren.

So then I saw Aren kind of – he was up on two legs. He was up on his hind

legs on the apprehension. Then I could see him kind of go down to all four legs

and he disengaged. And – but I could now see now the guy. Now he's –

It was like – I think I saw it

twice into him while he was on the apprehension, like thrust back towards him.

And then when Aren went from two legs to four legs – he's now off the bite – I

could see him now spinning. Now he's – now he's now progressing back towards

us, and he's just, like, thrusting at him, at my dog and –

And that's when I – I saw him. I mean, his arm was out, and he –now he

spun towards us. And from where I was not, that's when I just –I took my pistol

out, and I just – I just fired. And I remember firing and just watching him just –I

followed him down to the ground and stayed on him when he was on the ground, and then I just reholstered.

*(JA, 495- 498).*

.                      .                      .

Q.    What –what do you see next?

A.    With the knife, he spins to his left, and he stabbed Aren

several times.

Q.    Now, as he's stabbing Aren, is –is Kelley's back to you?

A.    He's spinning. So as he's –so he's going from across his body.

So he's contorting his body to reach around and stab Aren in

the  -- in the side of the head.

Q.    So when he stabs – how many times did he make movements

like stabbing motions?

A.    He made several stabbing motions from right to left.

Q.    How many is several?

A.    Two or three.

Q.     And when he's trying to stab Aren, is Aren on the ground or

Is Aren up off the ground? Like attached to his shoulder, biting

him or –

A.     So we wasn't trying to stab him; he was stabbing him. And

Aren initially was up off the ground, but when he stabbed him,

he then dropped down to all fours.

Q.     And from your – the way Kelley's body was positioned,

you could actually see his right hand moving towards

Aren?

A.     I could see the knife going into Aren.

Q.     Okay. And where in Aren's body was the knife going?

A.     The side of his head.

Q.     Which side.

A.     Left side.

Q.     What do you do at that point, sir?

A.     I – you have to define that. I'm not sure what you mean.

Q.     I mean, do you scream something at Kelley? Do you start running towards Kelley and the dog? Do you say or do anything?

A.

Because when Aren went down to all fours, okay, from being stabbed, now he's facing Aren. And Aren starts to come back in for an apprehension again into, you know, his –

His—facing Kelley. And now he's – now I see him thrashing upwards underneath his chin – or under – not his chin. underneath his jaw.

Q.     You see Aren thrashing underneath Kelley's jaw?

A.     Correct.

Q.     Had you moved yet from where  you were on the sidewalk? Had you moved yet in any direction?

A.     Yeah. So I had moved forward towards Kelley, on his right side.

Q. Okay. Say, how many steps did you take towards Kelley?

A. Several.

Q. And at this point, as you're describing, the dog is thrashing underneath Kelley's jaw. The dog is – is this the dog's second attempt to apprehend Kelley, from what you were witnessing?

A. Correct.

Q. And so the second attempt, the dog got off of the ground completely?

A. Yes. He started back in for an apprehension – apprehension. And that's when the suspect, with the knife, came upwards under his jaw and started just thrashing up –upwards.

Q. Do you see what part of Kelley's body Aren was trying to bite on the second attempt?

A. He was just trying to move in towards his chest area.

Q. Okay. And then is your gun out of its holster yet?

A. No.

Q.     Okay. So go ahead. Just what – what happens next? What
       do you see? What do you do?

A.     So then once – after he's done stabbing Aren, he spins
       towards me and takes a step with his knife, with the
       knife. And that's when I drop my leash and unholster my
       gun and fire.

Q.     I'm sorry. He spins towards you. He took a step towards
       you. And you just said something about his knife. I just
       didn't quite catch it.

A.     I said he raised the knife and stepped towards me.
       And that's when I unholstered and fired.

Q.     Okay. Which – did he step towards you with the left foot?
       Right foot?

A.     I don't recall.

Q.     Okay.

A.     He moved in my direction.

Q.     Were you still on the sidewalk at that point in time?

A.    No.

Q.    Where were you, sir?

A.    I was on the street now.

.                    .                    .

Q.    And before he moves in your direction, how far was

Kelley from you?

A.    8 feet.

*(JA 270-279).*

As far as Kelley allegedly "stepping" towards O'Malley, Kelley was fully engaged with defending himself against the attack of the 124 pound German Shepherd. (*JA 527-529).*

<u>Ravotti's Interview with Homicide Detectives.</u>

"Once [O'Malley] gave the command, I was – I still kept lethal cover on him, but I was watching. I saw K-9 Aren come in. And he did engage the suspect on his right – or I'm sorry – his left upper arm between his shoulder and his elbow.

At this time – so the suspect was standing – he was basically facing us, but he stepped back. He was almost on the stoop of that house. And he bit him. K-9 Sergeant O'Malley was right to my right. We were basically standing on that sidewalk almost.

When he bit, Aren, when Aren bit him, he started to spin, like, around in a circle, like, away from us. And as he was spinning, I saw him come around with the knife and stab at Aren. Once he stabbed at him and he spun around – as he was spinning, Aren actually disengaged his bite.

So at that point, Aren hit the ground. Aren come back up at him. It appeared that he was going to re-engage. As he was re-engaging, the suspect was, like, slashing at him, trying to – to stab at him again.

And that's when he actually started taking steps towards – more towards Sergeant O'Malley than myself. But he took about – almost two full steps at Sergeant O'Malley. And on the third one is whenever he - - he slammed the knife

into K-9 Aren. And that's when I saw – the knife actually went into – like, went down into his throat, and he had stabbed him.

At that time, he was still progressing towards K-9 Sergeant O'Malley. That's when K-9 Sergeant O'Malley, I believe, began to fire. Right at that point is when Aren actually fell down, like, fell off.

And I didn't fire at that point because Aren was in my sight. I didn't want to –

So Aren took like a – he started to run behind us.

And at that point, I felt that we had exhausted every nonlethal force option that we had and that in the interest of all parties involved – the suspect, I mean, ourselves, K-9 Aren, all the innocent bystanders that were outside – that I had no other choice but to use lethal force.

At that point, I did fire two rounds, aiming for center mass on the suspect. At that point, he suspect did fall. He fell on his back.

*(JA 529   ; Ravotti Interview page  17 – page 19).*

<u>Ravotti's deposition version.</u>

Q.    Well, were you looking Kelley?

A.    Yes.

Q.    Okay.

A.    And he was walking away from us.

Q.    Okay. What do you see happen next, please?

A.    At that time, Bruce Kelley starts to turn from his right to this left. And at that time, he started slashing across his body and stabbing the K-9 in the head.

Q.    So his back is turned to you. Is that right?

A.    He was turning in  -- in that process, he was turning.

Q.    And in the process of turning, his back is to you. Correct?

A.    It – it started at the back of me and then began – he turned around. As he turned around, he was then facing us.

Q.    Okay. What – what happens right after you see those motions by Kelley?

A.    After that, Kelley is pretty much facing directly at Sergeant O'Malley. Aren disengaged. Kelley took about two steps towards Sergeant O'Malley. K-9

Aren attempted to re-engage. And as K-9 Aren's head was coming up to re-engage again, Kelley took the knife and stabbed it into K-9 Aren's throat and continued in the direction of K-9 Sergeant o'Malley.

Q.    Okay. So Kelley is facing O'Malley at this point. You say he took two steps towards O'Malley?

A.    Yes.

Q.    And --

A.    He was slashing – he was slashing at Aren. As he was taking steps forward, Aren came up to attempt to engage again. And then Kelley stabbed the knife into Aren's throat area. And then after that is when K-9 Aren fell to the ground.

And he – he was continuing towards Sergeant O'Malley with the knife in his right hand. His knife was out in front of him, facing Sergeant O'Malley.

Q.    And so Aren engaged Kelley two different times. Is that right?

A.    He attempted to. I don't know if he got a full engagement on the second time or not. But, yes, he attempted to.

Q.    Now, was there a – a gap in time between Aren's first engagement of

Kelley and the second, or was it just kind of immediate?

A.    It was very short. It was not like a large gap of time. It was pretty

fluid.

Q.    And when does Kelley take two steps towards O'Malley?

A.    After he – as he spun around, after K-9 Aren disengaged, he took the

steps towards K-9 Sergeant O'Malley and was slashing the knife at K-

9 Aren.

And then K-9 Aren attempted to make the second – re-engage the

second time. And then that's when he slashed – he stabbed K-9 Aren

again in the throat.

Q.    And what did you do?

A.    As soon as K-9 Aren hit the ground, K-9 Aren started towards my left.

And that is when I fired my weapon.

*(JA,  402-405).*

## The Defendants' stated justifications for using deadly force.

O'Malley and Rivotti testified that they killed Kelley, in part, to protect the general public/civilians. *(JA 529).* No civilians were in the area. O'Malley and Ravotti testified that they killed Kelley, in part, because the lives of their fellow officers were in danger.

*(JA 529).*

Yet, no other Officers in the area were close enough to be harmed by Kelley.

*(JA 529).*

Ravotti admitted that he shot Kelley twice on behalf of Aren.

*(JA 529).*

<u>Procedural History:</u>

Upon the Plaintiffs/Appellants filing a Complaint, the Appellees filed Rule 12(b)(6) Motion thereto.

The lower Court granted the Rule 12(b)(6) Motions and further dismissed the original Complaint, with prejudice, on the basis that any amendment would be futile.

The Kelleys appealed.

At No. 18-3283, this Court reversed the lower Court.

## RULING PRESENTED FOR REVIEW.

The ruling under review is the lower Court's grant of Summary Judgment to the Defendant Police Officers.

**RELATED CASES AND PROCEEDINGS:**

A related proceeding was Appellants appeal in this case of the Order and Opinion of the lower Court dated September 13, 2018 which granted the Appellees' Rule 12(b)(6) Motion and dismissed the Appellants' Complaint.

This Court reversed the lower Court at No. 18-3283.

**STANDARD OF REVIEW:**

This Court's review of an order granting a Motion for Summary Judgment is de novo and plenary. <u>Burns vs. Pa. Dpt of Corrections,</u> 544 F.3d 279, 285 (3rd Cir. 2008) .

---

**SUMMARY OF ARGUMENT:**

1.      The lower Court erred in granting Summary Judgment for the Defendant Officers by granting them qualified immunity in this deadly force case.


2.      In so doing, the lower Court erred by concluding that no genuine issue of material fact existed as to whether Kelley made movements towards the Officers as he was being attacked by the Officers' K-9.


3.      In so doing, lower Court erred by concluding that no genuine issue of material fact existed as to the distance between Kelley and the Officers when they started shooting him while he was in the midst of fighting off the 124 pound German Shephard.


4.      The lower Court also overlooked/misapprehended other material facts of record.

5.      Kelley's constitutional right to be free from being shot to death while he fought off the K-9 was 'clearly-established' such that the Officers knew that they were violating his right to be free from deadly force. In other words, this is/was an obvious case under <u>Tennessee vs. Garner</u> and <u>Graham vs. O'Connor</u>.

**ARGUMENT:**

<u>The premise for the lower Court's grant of Appellees' Summary Judgment Motion.</u>

The lower Court ruled that no genuine issue of material fact existed as to 2 facts in this case. One, whether or not Kelley "made movements" towards O'Malley when Kelley was defending himself against the 124 pound German Shephard and two, the distance between O'Malley and Kelley when O'Malley started shooting at Kelley. *(Opinion, page 20).* The lower Court ruled that the Appellants failed to present sufficient evidence to demonstrate that a genuine dispute of material fact exists as to these 2 facts. On this basis, the lower Court held that the Appellee Police Officers were entitled to qualified immunity. It granted their Summary Judgment Motion.

<u>Law.</u>

In a Fourth Amendment deadly force case, a Plaintiff must show that a seizure occurred. There is no question that shooting and killing an individual constitutes a "seizure" under the Fourth Amendment. <u>Tennessee vs. Garner</u>, 471 U.S. 1, 7 (1985). It is unreasonable for a police officer to use deadly force against a person unless the officer had good reason to believe that the person posed a significant and immediate threat of death or serious bodily injury to the officer or

others. Garner, 471 at 3. The standard is one of objective reasonableness at the moment. Lamont vs. New Jersey, 637 F.3d 177, 183 (3rd Cir. 2011).

An officer can raise the affirmative defense of qualified immunity. To determine whether an officer is entitled qualified immunity, the questions are (i) whether the officer violated a clearly established constitutional right, and (ii) whether that right was clearly established such that it would have been clear to a reasonable officer that his/her conduct was unlawful in the situation he/she confronted. Saucier vs. Katz, 533 U.S. 194, 201-202 (2001). Anderson vs. Creighton, 483 U.S. 635, 640.

### The Third Circuit's cardinal caution in deadly force cases.

The lower Court violated this Circuit's cardinal caution governing deadly force cases:  not to accept the Officers' self-serving accounts of what transpired when they have killed the only other witness to what happened, here, Bruce Kelley, Jr.. Abraham vs. Raso, 183 F.3d 279, 294 (3rd Cir. 1999):

> "Because the victim of deadly force is unable
> to testify, we have recognized that a court ruling
> on summary judgment in a deadly force case 'should
> be cautious to ensure that the officer[s] are not taking
> advantage of the fact that the witness most likely to
> contradict [their] story – the person shot dead -  is unable to

testify. Thus, a Court should avoid simply accepting
what may be a self-serving account by the officers. It
must also look at the circumstantial evidence that**, if
believed,** would tend to discredit the police officers story,
and consider whether this evidence could convince a
rational fact finder that the officer[s] acted unreasonably.

Lamont vs. New Jersey, 637 F.3d 177, 182 (3rd Cir. 2011)(**Emphasis added).**

Notably, the "if believed" component of this caution to lower courts is a
reference to credibility determinations. Of course, credibility determinations are for
a jury to make.

### The lower Court, in examining the discovery record, violated this cardinal caution of deadly force analysis.

At page 7 of its Opinion, the lower Court stated:

"The Court recounts O'Malley's version of what happened in full".

Implicit in this language is that the lower Court finds one version of
O'Malley's story to be true – despite the fact that he materially contradicted
himself on the critical, material fact of whether or not Kelley stepped towards him.

In O'Malley's first version - given to the Homicide Detectives just days after the incident - O'Malley made no mention whatsoever of Kelley allegedly walking towards him or stepping towards anybody. O'Malley only stated that Kelley "spun" towards O'Malley as Kelley was defending himself against the 124 pound German Shephard.  This is a direct and material contradiction by O'Malley. A reasonable jury could conclude that O'Malley's one version given just days after the event, that Kelley merely "spun" – with no mention of any steps toward anybody - was more likely to be true than O'Malley's subsequent version of events. When a witness/party gives materially different versions of an event, it is not only within the exclusive province of a jury to make the necessary credibility determinations, it is their specific function and duty.

A reasonable jury could conclude that O'Malley changed and embellished his story once he was sued and prepped for this deposition, where, for the first time, he claimed that Kelley took steps toward him.

In <u>Brosseau vs. Haugen</u>, 543 U.S 194 (2004), the Supreme Court explicitly directed that trial judges **not try** to answer the question of qualified immunity as a matter of law – especially when inherent, intrinsic factual disputes must be made first:

> "The question here of the Defendants entitlement to
> qualified immunity is a quintessentially "fact-specific"

question, **not a question that judges should try to answer "as a matter of law".** Citing <u>Anderson</u>, 483 U.S. at 641. Although it is preferable to resolve the qualified immunity question at the earliest possible stage of the litigation, **this preference does not give judges license to take inherently factual questions away from the jury.**

<u>Brosseau vs. Haugen,</u> at 206.

In <u>Tolan vs. Cotton</u>, 134 S.Ct. 1861 (2014), the Supreme Court again cautioned that at the Summary Judgment stage:

> "[District] Courts must take care not to define a case's context in a manner that imports genuinely disputed factual propositions".

<u>Tolan vs. Cotton</u>, at 657.

Here, the Appellants are not arguing merely that a jury is always free to discredit a Defendants' account at trial. The Appellants pointed out to the lower Court material contradictions by O'Malley. In conjunction, the other record evidence creates a genuine issue as to the movements of Kelley, specifically, the eyewitness accounts of Officer Hahn and Officer Granger. Officer Hahn testified:

A.    If he would have been – I was coming out between the houses, and he was probably near 1 o'clock. I don't remember how far. I don't remember if he was on the other side of the street or on my side of the street. **I just heard the gunfire, and I saw the guy with the – the bad guy with the dog in the air.**

The dog "in the air" means that O'Malley's K-9 Partner was in the midst of its attack upon Kelley when O'Malley and Ravotti started shooting Kelley. A jury could easily conclude that this was unreasonable, unlawful, deadly force.

Additionally, eyewitness Officer Granger corroborated Hahn and likewise directly contradicted O'Malley and Ravotti:

"Everything was pretty much –
**when the dog was stabbed, shots
were fired**. It happened very quickly.
I mean, I'm still focused on Kelley".

Q.    How much time elapsed – I know
you're not thinking of it in that moment but
looking back, in between the dog gets stabbed
and the first shot is fired?

A.    Seconds."

There were no steps or movements by Kelley towards anyone after his encounter with O'Malley's K-9 Partner. The eyewitness accounts of Officers Hahn and Granger, looked at at face value – and most certainly looking at them in the light most favorable to the Appellants, create a triable and genuine issue of material fact as to whether Kelley took steps towards O'Malley while in the midst of a fight for his life with the 124 pound German Shephard which would reasonably give O'Malley fear that Kelley was going to kill or seriously harm O'Malley. A reasonable jury could find Hahn and Granger's accounts more credible than O'Malley's and Ravotti's. O'Malley and Ravotti's accounts are inherently self-serving.

Additionally, Officer Kaupinis' Official Report likewise made no mention of any steps Kelley made toward anybody. His Report, composed that day, only documented totally undescribed "motions" by Kelley. At his deposition however, Kaupinis' version, like O'Malley's, changed substantively and substantially. Kaupinis changed mere undescribed "motions" as "forward motions". He then went on to actually claim that Kelley took 5 steps toward O'Malley. Since any alleged movements by Kelley is a material fact, these contradictory versions are subject to challenge in front of a jury for the jury to evaluate each witnesses credibility. Of course, observing the demeanor of each witness is inherent in

making these necessary credibility determinations. The discovery record in this case clearly evidences an evolving narrative of the Appellees.

The lower Court violated the standard of review and did precisely what Abraham vs. Raso ruled it could not do: the lower Court accepted self-serving versions of the Officers through which they are trying to gain unfair advantage by because Bruce Kelley is dead. Kelley is not alive and cannot contradict the Officers' versions.

Fortunately, eyewitness Officers Hahn, Granger and Kaupinis directly contradict both Ravotti and O'Malley's versions.

Next, at page 10 of its opinion, the lower Court concluded

"that Kelley turned **to face** O'Malley". **(Emphasis added).**

What the lower Court did here was ignore, entirely, that a 124 pound German Shephard was **ON** Kelley's arm/body. A reasonable jury could certainly conclude/infer that the 124 pound dog on his arm is the reason why Kelley "turned" in the direction of O'Malley. Additionally, a reasonable jury could infer that Kelley never even saw O'Malley because O'Malley intentionally hid himself and his dog from Kelley behind bushes. He then released the dog on Kelley when Kelley's back was turned and Kelley was walking away from all of the officers. Because Kelley was engaged in a fight for his life with the dog, he may not have

even noticed O'Malley approaching him in the yard while he fought the dog off. Thus, a reasonable jury could conclude that Kelley never even knew O'Malley was in that yard before O'Malley started shooting Kelley. The same logic applies to Ravotti.

The lower Court also erred in concluding that only 2 material facts exist in this complicated scenario. A 3rd material fact is that a 124 pound dog was literally on Kelley's body at two different junctures during Kelley's fight with the dog. Thus, any movements by Kelley were involuntarily made. A reasonable jury could obviously conclude that the fact that the dog was on Kelley's upper left arm is what caused Kelley's torso to "turn".

There is no better example of a "genuine" dispute of material fact that when eyewitnesses directly contradict each other.

## This is an obvious case under Tennessee vs. Garner and Graham vs. O'Connor jurisprudence.

This is an "obvious" case as to whether or not the Officers violated a clearly-established constitutional right. In Russell vs. Richardson, 905 F.3d 239 (3rd Cir. 2018), this Circuit reiterated the long-standing principle in qualified immunity cases that in an obvious case, the standard enunciated in Tennessee vs. Garner, 473 U.S. 1 (1985) constitutes "clearly-established" law satisfying the requirement that

an officer be on notice that he was violating a clearly-established constitutional right.

O'Malley and Ravotti were certainly on notice that shooting Kelley while he was fully engaged with O'Malley's K-9 partner was unreasonable, unlawful deadly force.

## Appellants' definition of the clearly-established constitutional right  involved here is and was not "overly broad".

Appellants' definition is:

The clearly-established constitutional right the Defendants violated here was Kelley's 4th Amendment right under both Tennessee v. Garner, 471 U.S. 1 (1985) and Graham vs. O'Connor, 490 U.S. 386 (1989) to be free from the seizure of his body by the use of deadly/excessive force  when, looking at the facts in the light most favorable to the Appellants, Kelley did not pose a (i) significant and (ii) immediate threat of death or serious bodily injury to either Officer nor anyone else. Bruce Kelley, Jr. had a clearly-established constitutional right to not be shot to death by O'Malley and Ravotti while Kelley was fully engaged in a fight with the Officers' K-9, Aren.

Regarding the clearly-established constitutional right at-issue here, the lower Court ruled that this is not an "obvious case", but in so doing it impermissibly and

looked at the record facts in a light most favorable **to the officers**, not the Kelley Family. Obviously, this violates the Summary Judgment standard of review. The grant of Summary Judgment must be reversed.

The lower Court specifically concluded:

> "All evidence in the record indicates that Kelley and O'Malley were standing mere feet away from each other."

*(Opinion, page 29, first sentence of first full paragraph).*

First of all, if the movements made by Kelley were involuntarily made as he was being pulled and twisted by the dog while fighting the dog off, this is a material fact which weighs on the distance issue. A reasonable jury could infer that whatever distance existed between O'Malley and Kelley at the time the Officers started shooting at Kelley was a result of involuntary movements by Kelley.

Secondly, O'Malley admitted walking towards Kelley while Kelley was fighting off the dog. A jury could infer that O'Malley walked towards Kelley because O'Malley did not fear for his own life and thus was not in fear, at all.

Pivotally, the lower Court ruled:

> "Whether it was spinning towards, progressing
> towards, or stepping towards O'Malley, the
> record demonstrates that Kelley made a forward
> movement **of some kind** in the direction of
> O'Malley."
>
> *(Opinion, page 33, mid-page*)**(Emphasis added).**

Of some kind? As in, involuntary movements by Kelley due to the dog? Kelley was fully engaged with defending himself against the dog - who was so ferocious that it made 2 separate attacks on Kelley: once on Kelley's back left tricep -when Kelley's back was to the dog. The second, **and after the dog was wounded** - the dog came at Kelley once again, going for Kelley's chest/throat area.

The lower Court as well misconstrued the facts contained in the ACPD and OME Homicide Investigation Reports:

> "At the very least, the documents do not contradict
> O'Malley and Ravotti's testimony; the documents simply
> omit mention of Kelley's movements; they do not say he stood
> still before being shot". *(Opinion, page 31, mid-page).*

Here the lower Court fails to give the fair inference to the Appellants that the
Homicide Detectives knew to investigate whether or not Kelley took any steps
towards the officers. This was a homicide. There was no question as to that. The
primary issue to be investigated was whether it was justified or not. The Homicide
Detectives knew the significance of Kelley walking/stepping towards the officers.
They would have included this, if it in fact happened, in their Reports. Here, the
lower Court accepted one self-serving version of the Officers over Official Reports
of neutral, independent investigators to the direct contrary.

### Other material facts which the lower Court overlooked:

1.      Kelley's Mental illness

As Officer Hahn testified, and as a reasonable jury could infer, Kelley not putting
down the knife could have been attributable to Kelley's mental illness, not
defiance, and not because Kelley was intent on harming anyone. This goes directly
to the reasonableness issue of the uses of force of deploying the dog and killing
Kelley.

2.      The lower Court failed to address in any meaningful fashion the  2
unexplained shots directly to Kelley's back.

The two shots to the back could have been the first two shots fired. Shooting Kelley in the back while he was fighting with the dog constitutes unlawful deadly force.

3.      The lower Court never addressed the reasonableness of the use of force of O'Malley deploying the K-9 on Kelley.

O'Malley purposefully concealed the dog from Kelley behind bushes. This is despite the fact that O'Malley admittedly knew from personal experience that him merely showing the 124 pound German Shephard could scare a suspect into surrendering. Here, O'Malley did not give Kelley the opportunity to see the German Shepherd. Had O'Malley given Kelley this opportunity, it may have caused Kelley to surrender immediately/drop the knife, thus eliminating the need for deployment of the dog altogether. Yet, as O'Malley admitted, he was committed to deploying his K-9 - no matter how the circumstances developed.

We also don't know if Kelley even heard O'Malley's warning that O'Malley was going to deploy the dog on Kelley:

(i)  Kelley was walking away from O'Malley;

(ii)   at the same point in time that O'Malley was allegedly warning Kelley about deploying the dog, other Officers were shouting at Kelley to drop the knife;

(iii)   Kelley was quite a distance from O'Malley;

(iv)    since O'Malley hid behind bushes with the dog, we don't know

if Kelley ever saw O'Malley or the dog.

The lower Court also used the wrong legal standard when it referred – only in passing – to O'Malley's deployment of the dog. The lower Court spoke in terms of whether O'Malley "negligently" deployed the dog. But this is not a negligence case. This is a use of force case, and the correct standard is reasonableness. Because Section 1983 constitutional torts are a species of state tort law, state law on causation governs this issue. The law on proximate causation is that it is a question of law only if reasonable minds could not differ on whether or not Kelley's alleged behavior caused the Officers' use of deadly force. Hayes vs. Easterday, 879 F. Supp.2d 449 (E.D. Pa. 2012); James vs. Duquesne University, 936 F.Supp. 2d 618 (W.D. Pa. 2013). If reasonable minds could differ, proximate causation is a question of fact, not law, and is for a jury to determine. Here, a reasonable jury could conclude that Kelley did nothing which caused his own death other than defend himself against the dog.

Finally, on this issue, the lower Court was required to look at the totality of the circumstances and determine if the officers' reckless conduct created their need to use deadly force. The lower Court failed to do so.

A reasonable jury could conclude that O'Malley's deployment of his K-9 partner, looking at the facts in the light most favorable to the Kelley family, was unreasonable. Even if it wasn't, a reasonable jury could conclude that the use of deadly force was objectively unreasonable - looking at the facts in the light most favorable to the Appellants.

4.      The lower Court overlooked the zero attempts by O'Malley and Ravotti to de-escalate the situation.

5.      On the distance from Kelley issue, the lower Court overlooked that O'Malley repeatedly stated in his deposition that he could not answer where he was nor where Kelley was at the critical junctures. Therefore, a reasonable jury could discredit his claim that he and Kelley were "8 feet" apart when he started shooting Kelley because O'Malley initially and repeatedly testified that he could not answer this question.

6.      The lower Court overlooked that the Officers have, importantly, already admitted in deposition testimony that they shot and killed Kelly, in part, for impermissible reasons:

(i)     to protect the "general public" and civilians - despite the **total absence** of any civilians in the area where Kelley was;

(ii)    to protect other officers who were "on scene" - yet **nowhere near Kelley** at the critical junctures;

(iii)   and in the interest of the K-9, a dog who is **not** considered an Officer in this legal context.

If even one admitted, partial reason to utilize deadly force is objectively unreasonable/unlawful, it is submitted that the use of deadly force was objectively unreasonable/unlawful.

7.      The lower Court overlooked the Officers' violation of their own Policies in failing to create the required Use of Force, K-9 Deployment and usual Incident Reports. This is a material fact. It is a material fact because reasonable jurors could conclude that the Officers purposefully did not memorialize what occurred that day/failed to compose Reports in order to keep their story fluid, so that they could adopt, which they have in this case, an evolving narrative.

8.      The lower Court failed to consider as a material fact that Kelley, at no time in the 18-20 minutes leading up to his death, threatened an officer or a civilian with violence, or initiated violence with anyone. He just kept walking away.

## Kisela vs. Hughes is distinguishable from this case.

The <u>Kisela</u> case cited by the lower Court is distinguishable from this case because in <u>Kisela,</u> the victim was not being attacked by a 124 pound German Shephard. There was also no foreseeable person in the area whom Kelley could have taken hostage or harmed.

## Summary.

Like this Honorable Court held in reversing the lower Court at the Rule 12 stage in this case, the fact that Bruce defensively stabbed the dog does not mean that he intended to harm Officers O'Malley or Ravotti. It was error for the lower Court to conclude that no genuine issues of material fact exist.

**WHEREFORE,** the Appellants request this Honorable Court to **REVERSE** the lower Court's grant of Summary Judgment, and to remand for a jury trial in this matter.

Respectfully submitted,

Date: February 24, 2023

/s/ Noah Geary

Noah Geary, Esquire

Attorney for Appellants

123 Washington Street

Washington, PA 15301

724 222-3788

## CERTIFICATE OF COMPLIANCE:

1.      I, Noah Geary, Esquire, counsel for the Appellant, hereby certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit, having been duly admitted by written motion on November 20, 2000.

2.      This brief complies with the type-volume limitation of Federal Rule

of Appellate Procedure 32(a)(7)(B) because this Brief contains no more than 13,000 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(6)  because this Brief has been prepared in a proportional typeface using a MicrosoftWorks Word Processor using Times New Roman at 14 point.

3.      I, Noah Geary, Esquire, do hereby certify that two copies of Appellee's Brief and Appendix were served upon opposing counsel of record.

4.      I, Noah Geary, Esquire, hereby certify that the text of the foregoing e-filed Brief and hard copies of the Brief are identical.

5.      I also certify that a virus check was performed on Appellee's e-brief (PDF File) using AVG Anti-Virus Software.

Respectfully submitted,

s/ Noah Geary, Esquire
Noah Geary, Esquire

## CERTIFICATE OF SERVICE:

I, Noah Geary, hereby certify that I served the foregoing **APPELLANTS'**

**PRINCIPAL BRIEF and VOLUME I of APPENDIX** upon the following

counsel of record via ecf-filing this day:

*Counsel for Appellees:*

Greg Evashavik, Esquire

Suite 1801 Grant Building

Pittsburgh, PA 15219

412-261-2813

Date: February 24, 2023                           /s/ Noah Geary

Noah Geary, Esquire

Attorney for Appellants

123 Washington Street

Washington, PA 15301

724 222-3788