IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 22-1688

CALISIA KELLEY, JOHNNIE MAE KELLEY, CO-ADMINISTRATORS OF
THE ESTATE OF BRUCE KELLEY, JR., Deceased,

Appellants

v.

BRIAN O'MALLEY, both in his Official and Individual Capacities as Sergeant for
the Allegheny County Port Authority; DOMINIC RIVOTTI both in his Official
and Individual Capacities as Officer for the Allegheny County Port Authority,

Appellees

Appeal from the Judgment and Final Order and Memorandum Opinion dated
March 18, 2022 in the United States District Court for the Western District of
Pennsylvania at Docket No. 2:17-cv-1599 granting the Appellees' Summary
Judgment Motion

BRIEF OF APPELLEES

Gregory A. Evashavik, Esquire
PA ID: 47092
Nicholas J. Evashavik, Esquire
PA ID: 75935
Evashavik Law, LLC
310 Grant Street, Suite 2901
Pittsburgh, PA 15219
412-261-2813
*Attorneys for the Appellees*

# TABLE OF CONTENTS

Table of Contents…………………………………………….……..     i

Table of Authorities…………………………………………….………..     iii

Statement of the Issues……………………………………….…….……     1

Statement of the Case……………………………..…………………...     2

    A.  Procedural History…………………………………………...     2

    B.  Factual History…………………………………………………...     3

Summary of the Argument……………………………………….…     13

Argument……………………………………………………………     15

    I.  The District Court Correctly Found the Facts When Granting
       Summary Judgment in Favor of Defendants O'Malley and
       Rivotti………………………………………………………..     15

      A.  Standard of Review……………………………………..     15

      B.  Legal Standards at Issue………………………………...     15

         i.  The Use of Deadly Force……………………………     15

         ii.  Qualified Immunity………………………………….     18

         iii.  District Court Conclusions…………………………     22

      C.  Discussion……………………………………………….     22

         i.  Despite Plaintiffs' Contentions to the Contrary, Kelley, Jr.,
           Made a Movement in the Direction of O'Malley and There
           Was no Genuine Dispute of Material Facts as to the Same….     22

ii.  The District Court Correctly Concluded that no Genuine Dispute of Fact Existed as to the Distance Between O'Malley and Kelley, Jr., at the Time Shots Were Fired......    34

iii.  Conclusion……………………………………………    37

II.  The District Court Properly Considered Other Material Facts of Record …………………………….....................................    38

III.  The District Court Properly Determined That Based on the Facts Presented Here, O'Malley and Rivotti are Entitled to Qualified Immunity...........................................................................    46

Conclusion…………………………………………………..………    52

Certification of Bar Membership…………………………………...    53

Certification of Compliance…………………………………………...    54

Certificate of Service Upon Counsel………………………………….    55

# TABLE OF AUTHORITIES

**Cases**

Acumed LLC. V. Advanced Surgical Services, Inc., 561 F.3d 199 (3d Cir. 2009)…………………………………………………………    15

Bennett v. Murphy et al., 274 F.3d 133 136 (3d Cir. 2002)…………..    21

Blanford v. Sacramento County, 406 F.3d 1110 (9th Cir. 2005)……..    39

Davenport v. Borough of Homestead, 870 F.3d 273, 281 (3d Cir. 2017)………………………………………………………………….    49

Graham v. Connor, 490 U.S. 386 (1989)…………………………..    14

James v. New Jersey State Police, 957 F.3d 165, 168 (3d Cir. 2020)...    18

Johnson v. City of Philadelphia, et. al., 837 F.3d 343, 349-50 (3d Cir. 2016)………………………………………………………………..    16, 29, 30

Lamont v. New Jersey, 637 F.3d 177, 181-82 (3d Cir. 2011)………...    17, 30

Mullenix v. Luna, 577 U.S. 7, 11-12 (2015)…………………………    21

Russell v. Richardson, 905 F.3d 239 (3d Cir. 2018)…………………    49

Savers v. Borough of Nesquehoning, 905 F.3d 711, 719 (3d Cir. 2018)………………………………………………………………….    22

Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1789, (2007)………………..    38

Tennessee v. Garner, 471 U.S. 1 (1985)……………………………...    14

**Rules**

Federal Rules of Civil Procedure 12(b)(6)………………….…...    2

## STATEMENT OF THE ISSUES

I.    WHETHER THE DISTRICT COURT CORRECTLY FOUND THE FACTS WHEN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS O'MALLEY AND RIVOTTI?

    A.    STANDARD OF REVIEW

    B.    LEGAL STANDARD AT ISSUE

        i.    THE USE OF DEADLY FORCE

        ii.    QUALIFIED IMMUNITY

        iii.    DISTRICT COURT CONCLUSIONS

    C.    DISCUSSION

        i.    DESPITE PLAINTIFFS' CONTENTIONS TO THE CONTRARY, KELLEY, JR., MADE A MOVEMENT IN THE DIRECTION OF O'MALLEY AND THERE WAS NO GENUINE DISPUTE OF MATERIAL FACT AS TO THE SAME

        ii.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT NO GENUINE DISPUTE OF FACT EXISTED AS TO THE DISTANCE BETWEEN O'MALLEY AND KELLEY, JR., AT THE TIME SHOTS WERE FIRED

        iii.    CONCLUSION

II.    WHETHER THE DISTRICT COURT PROPERLY CONSIDERED OTHER MATERIAL FACTS OF RECORD?

III.    WHETHER THE DISTRICT COURT PROPERLY DETERMINED THAT BASED ON THE FACTS PRESENTED HERE, O'MALLEY AND RIVOTTI ARE ENTITLED TO QUALIFIED IMMUNITY?

## STATEMENT OF THE CASE

### A.    Procedural History

Plaintiffs Calisia Kelley and Johnnie Mae Kelley, Co-Administrators of the Estate of Bruce Kelley, Jr., initiated this action against Defendants Brian O'Malley, both in his Official and Individual Capacities as Sergeant for the Allegheny County Port Authority; Dominic Rivotti, in both his Official and Individual Capacities as Officer for the Allegheny County Port Authority; John Doe #1 Police Officer, in his Official and Individual Capacities; John Doe #2 Police Officer, in both his Official and Individual Capacities; John Doe #3, Supervisor of O'Malley, Rivotti and John Doe Police Officers, in his/her Official and Individual Capacities; the Allegheny County Port Authority; Matthew Porter, in his Official and Individual Capacities as Chief of the Allegheny County Port Authority Police; the County of Allegheny; and the Allegheny County Port Authority Police Department, in the United States District Court for the Western District of Pennsylvania (the "District Court") by Complaint filed December 11, 2017. (JA 1).  Therein, Plaintiffs asserted excessive force claims against O'Malley and Rivotti for the fatal shooting of Kelley, Jr., and Monell claims against Port Authority of Allegheny County and Port Authority Police Chief Matthew Porter.

Defendants filed motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (District Court Docket ("DCD") Nos. 10 and 13).  The

District Court granted those motions, and the Plaintiffs' Complaint was dismissed with prejudice on September 13, 2018 (DCD No. 25).

Plaintiffs appealed the dismissal of the Complaint to this Court on October 12, 2018. At docket number 18-3283, this Court, on September 24, 2019, vacated the District Court's dismissal of the Complaint limited only to the excessive force claims against O'Malley and Rivotti, and affirmed the dismissal of all other claims. The proceedings were then remanded to the District Court.

Plaintiffs and O'Malley and Rivotti then engaged in discovery. Ultimately, O'Malley and Rivotti filed a motion for summary judgment, supporting materials and a memorandum on May 5, 2021. (JA 1651). After extensive briefing and oral argument by the parties (JA 35-137), the District Court entered a thorough memorandum opinion and granted O'Malley's and Rivotti's motion for summary judgment on March 18, 2022. (Appellants' Appendix to Principal Brief p. 4). Judgment was entered in their favor and against Plaintiffs. (Appellants' Appendix to Principal Brief p. 3).

On April 13, 2022, Plaintiffs filed the instant appeal to this Court. (Appellants' Appendix to Principal Brief p. 1).

### B.    Factual History

On January 31, 2016 at approximately 3:30 p.m., Port Authority of Allegheny County ("PAT") Police Officers Thomas Adams and Emily Hampy were on routine

patrol in a marked police car traveling on the Port Authority East Busway (the "Busway") when they observed two (2) individuals on foot duck behind a sound wall adjacent to the Busway upon the approach of their marked police car. (JA 828-830, 875-876).  Based upon what Adams and Hampy perceived to be suspicious behavior, they parked their police vehicle, notified dispatch and exited on foot to investigate. Adams reported this on the police radio. (JA 828-830, 877-878; DCD No. 120-1 at Q – audio recordings).

The area where the two (2) unknown individuals ducked behind the sound wall is a walking path known as the Linear Trail which is adjacent to the Busway and is an access route for PAT customers to get to and from a bus stop. (JA 830, 878).  This area, located in Wilkinsburg Borough, was known to PAT and Wilkinsburg Borough Police as a high crime area, including drug sales, drug use, vandalism of PAT property, robbery and assaults of individuals (including PAT patrons). (JA 830).

Adams and Hampy did not encounter any individuals on the Linear Trail, but continued walking to a set of stairs that leads down from the trail to a gazebo, which is immediately adjacent to the trail and Busway, and which is located at a lower elevation. (JA 831-832, 878-880).  From the trail, Adams and Hampy observed two (2) men sitting in the gazebo with open and closed cans of beer around them. (JA 832-834, 880-885).

Adams and Hampy proceeded down the steps to the entry area of the gazebo, (JA 834-836, 884), where Adams made verbal inquiries to both men in the gazebo. Neither man responded, (JA 836-837, 884-886).

The men in the gazebo were later identified to be Bruce Kelley, Jr., and Bruce Kelley, Sr. (JA 838, 883, 887). Kelley, Jr., began walking towards Adams, who was standing at an open entry area to the gazebo, and pushed his left shoulder into the chest/shoulder area of Adams. (JA 840-843, 888, 895-899). Adams then attempted to place Kelley, Jr., under arrest for assault, but Kelley, Jr., would not cooperate. Kelley, Jr., refused to comply with the orders of Adams and Hampy. (JA 841, 900). A physical struggle ensued between Kelley, Jr., and Adams as Adams was attempting to place Kelley, Jr., in handcuffs. (JA 844-846, 900-902).

Kelley, Sr., rushed Hampy and punched her in the face, giving her a concussion. (JA 890, 905-907). Hampy deployed OC (pepper) spray twice in an attempt to subdue Kelley, Sr. (JA 908-914).

Adams deployed OC (pepper) spray on Kelley, Jr., but it had no effect. (JA 846-848). As Hampy was assisting Adams trying to take Kelley, Jr., into custody and handcuff him, Kelley, Jr., struck Hampy in her face with his right hand/fist. (JA 936-937). Adams suffered injuries to his left hand and shoulder in the scuffle with Kelley, Jr. (JA 857-860, 1145-1146).

While Adams continued his attempts to handcuff Kelley, Jr., Kelley, Jr., pulled out a knife from inside his coveralls, held it out away from him, and swung it in the direction of Adams, who was behind Kelley, Jr., at the time. (JA 853-856, 918-920). Adams immediately jumped back to create distance between himself and Kelley, Jr., for his safety. Kelley, Jr., held the knife close to Adams who was in fear of being stabbed. (JA 854-855, 919-920).

Adams called on the police radio requesting backup assistance because Kelley, Jr., was resisting arrest and had a knife. (JA 857, 945-948, 958, 1029-1031, 1141-1143, 1205, 1223, 1260, 1317-1334; DCD No. 120-1 at Q – radio audio recordings). Adams and Hampy also gave repeated commands to Kelley, Jr., but the commands were ignored. (JA 846-855, 935-936). The entire encounter at the gazebo lasted 3-5 minutes. (JA 934-935).

With knife in hand, Kelley, Jr., walked back up the steps leading towards the Linear Trail and proceeded along the trail. (JA 857, 1142). Wilkinsburg Police Officer Shawn Granger arrived on the scene as Kelley, Jr., was leaving the gazebo area and walking up the steps. (JA 857, 923-924, 1143-1145). Granger gave verbal commands to Kelley, Jr., but he did not comply. Instead, Kelley, Jr., responded with profanities. (JA 923, 1151, 1155). While pursuing Kelley, Jr., on the Linear Trail, Granger deployed his Taser twice on Kelley, Jr., but it had no effect. (JA 863-864, 1155-1158).

Other police officers also arrived on the scene and all pursued Kelley, Jr. (JA 949-953, 1105-1111, 1204-1209, 1223-1230, 1259-1276, 1281-1293). Indeed, police officers responded from multiple jurisdictions including PAT, Edgewood Borough, Swissvale Borough and Wilkinsburg Borough. (JA 1106-1107, 1138-1144, 1221-1225, 1257-1263, 1280-1288).

Adams, Hampy, Granger and Wilkinsburg Police Officer Michael Catanzaro were following Kelley, Jr., on foot on the Linear Trail. (JA 861-864, 924-927, 952-959, 1152-1165, 1284-1290). Other police officers were walking on the Linear Trail simultaneously coming from the opposite direction towards Kelley Jr. (JA 864, 951-960, 1107-1112, 1155-1165, 1223-1226). Officers had their guns drawn because Kelley, Jr., had assaulted police officers, was brandishing a knife and resisting arrest. (JA 861-862, 952, 955-956, 986, 1113, 1236). Kelley, Jr., continued to hold the knife and continued to walk at a brisk pace. (JA 952-956, 1107-1110, 1283-1286).

Faced with officers approaching from both directions, Kelley, Jr., then turned off of the trail and down a hillside through a wooded area to a fence that had an opening and went through the fence into a residential area of Wilkinsburg Borough. (JA 866-867, 927, 959, 1165-1166, 1225-1227, 1286-1287). A foot pursuit continued by the various police officers following Kelley, Jr., who continued moving at all times, walking at a fast pace. (JA 959-992, 1016, 1034-1042, 1046-1047, 1063-1070, 1107-1123, 1224-1238, 1317-1334; DCD No. 120-1 at Q and R). Kelley, Jr.,

continued to walk away from the officers by cutting through yards, between houses, and on the residential streets; he was continuously moving away from the police officers. (JA 960-989, 1064-1078, 1110-1125, 1166-1174, 1226-1237, 1317-1334; DCD No. 120-1 at Q and R)

During this time, multiple police officers on multiple occasions deployed Tasers and OC (pepper) spray against Kelley Jr., none of which had any effect on him. (JA 846-849, 863-864, 966-984, 1037-1038, 1066-1075, 1157-1159, 1170-1172, 1249, 1289-1291, 1317-1334; DCD No. 120-1 at Q and R).  Multiple officers gave repeated commands – dozens of times – to Kelley, Jr., to stop, to drop the knife and to get on the ground. (JA 957, 975, 1037, 1066-1067, 1108-1116, 1119-1120, 1169, 1171, 1173, 1227, 1249, 1266, 1290-1291).

Kelley, Jr., could hear and understand the commands because every time commands were given he would respond with profanities. (JA 731, 737-738, 1066-1067, 1108-1112, 1118-1120, 1155, 1173, 1192, 1293).  However, Kelley, Jr., never complied with any of the police commands; instead, he repeatedly raised the knife towards the officers. (JA 723, 731-732, 736, 746-747, 955-957, 1014-1015, 1038, 1065, 1111-1113, 1268, 1289-1291, 1305, 1317-1334; DCD No. 120-1 at Q and R - videotape).

PAT Police Officer Kyhnroe Sanders was involved in this foot pursuit and attempted to approach Kelley, Jr., from behind with his ASP baton, hoping to strike

Kelley, Jr.'s right hand or wrist to knock the knife out of his hand.  As Sanders got close to make this attempt, Kelley, Jr., whipped around and swung the knife in the direction of Sanders, and pointed it directly at him. (JA 966, 978-979, 1037-1040, 1234-1236, 1317-1334; DCD No. 120-1 at R - videotape).

Videotape from the PAT Hamnett Station Park and Ride parking lot video camera Pole No. 2 captured a portion of the foot pursuit, showing numerous officers following Kelley, Jr., as he walks through the parking lot as well as Sanders' attempt to approach Kelley, Jr., from the rear with his ASP, at which time Kelley, Jr., whips around and swings the knife at Sanders. (DCD No. 120-1 at R - videotape).

After the encounter with Sanders, Kelley, Jr., continued walking away from the police officers and ignoring all commands; he then climbed over a fence and cut through some yards to Whitney Avenue; and officers' deployment of Tasers and OC (pepper spray) were made again with no effect. (JA 979-987, 1171-1173, 1236-1237, 1317-1334; DCD No. 120-1 at R - videotape).  On Whitney Avenue, Kelley, Jr., walked down the street and sidewalk area towards the dead-end of the street which abuts the Busway and a pedestrian tunnel when Defendant PAT Police Sergeant K-9 Handler Brian O'Malley saw him approaching; O'Malley had taken cover behind some bushes across the street. (JA 494, 794-797).

K-9 Handler O'Malley stepped out from the bushes on Whitney Avenue and gave warnings to Kelley, Jr., to stop and drop the knife or he would release his K-9.

9

(JA 495, 797-800, 991, 997-1000, 1177, 1238-1239, 1294).  Kelley, Jr., ignored the K-9 warnings and continued to walk. (JA 495, 795-801, 997-1000, 1177, 1183). O'Malley released K-9 Officer Aren who rushed Kelley, Jr., jumped up and bit his upper left arm/left shoulder area. (JA 497, 527-528, 747-750, 801-802, 805, 1001-1002, 1184-1185, 1295).

Kelley, Jr., swung around with the knife in his right hand and stabbed K-9 Aren repeatedly in the face and neck area. (JA 497, 527-528, 749-752, 805-808, 1001-1003, 1188, 1241, 1295).  The knife injuries caused K-9 Aren to drop off from the apprehension on Kelley, Jr. (JA 528-529, 751, 806-808, 1002-1003).

Kelley, Jr., then directly faced and immediately moved in the direction of O'Malley with uplifted knife in hand who was eight feet away. (JA 498, 528, 750-752, 808-812, 1003-1007, 1190, 1296, 1303, 1313).  O'Malley unholstered his gun and fired repeatedly until Kelley, Jr., fell to the ground. (JA 498, 811-814, 818-821, 1006-1007).  O'Malley discharged his weapon multiple times continuously within a matter of 1-2 seconds. (JA 814, 818-820).

Simultaneously, Defendant PAT Police Officer Dominic Rivotti fired his weapon at Kelley, Jr., until Kelley, Jr., fell to the ground. (JA 529, 752-756, 1106-1007).  Rivotti discharged his weapon two (2) times continuously. (JA 752-756).

After Kelley, Jr., fell to the ground he was still holding the knife in his right hand, and the knife had to be removed by the police officers. (JA 756, 1125-1126,

1133, 1195).  Medical aid was rendered to Kelley, Jr., but he died at the scene. (JA 932, 1009, 1101, 1125-1126, 1215-1218).

Notably, continuous updates of the pursuit of Kelley, Jr., were reported over the radio, including the numerous unsuccessful attempts to deploy Tasers and OC (pepper) spray. (JA 864, 1159-1160, 1317-1334; DCD No. 120-1 at Q – audio recordings).  Defendants O'Malley and Rivotti heard this information as it was reported on the radio during the pursuit. (JA 718, 721, 725-726, 779-786, 792-794, 823-824, 1317-1334).  There were numerous civilians including children in the area where the foot pursuit was occurring. (JA 722-726, 868, 938-939, 962-963, 1011, 1019, 1034, 1052-1053, 1114-1116, 1132, 1197-1199, 1227-1229, 1250-1252, 1277-1278, 1298, 1304).

Kelley, Jr., was continuously moving at all times and never obeyed any of the police commands. (JA 731-733, 737, 763-768, 1015-1017, 1055, 1064-1070, 1092, 1107-1122, 1192, 1249, 1268-1270, 1317-1334).  He never dropped the knife during the entire pursuit. (JA 764-768, 1018, 1065, 1107-1122, 1174, 1182-1183, 1317-1334).  Kelley, Jr., was never surrounded or cornered by the police officers; rather, he always had an open path in front of him as he continued to quickly walk away from the pursuing police officers. (JA 767, 1018-1019, 1055, 1170, 1194-1195).

At various times during the pursuit, Kelley, Jr., pointed, waved and slashed with the knife he was holding in the direction of the pursuing officers. (JA 736, 745-

747, 1015, 1111-1112, 1131, 1135-1136, 1268, 1289, 1317-1334).    O'Malley, Rivotti and the other pursuing police officers believed that Kelley, Jr., posed a significant threat of death or serious physical injury to the officers and others. (JA 746, 760, 768, 824, 939, 1018-1019, 1056, 1135-1136, 1194-1195, 1244-1245, 1250-1255, 1276-1278, 1303-1305, 1308-1309).    O'Malley, Rivotti, and the other officers in pursuit believed that Kelley, Jr., was actively resisting arrest and attempting to evade arrest by flight. (JA 767-768, 817, 824, 939, 1019, 1055, 1196-1199, 1247, 1277, 1306).

O'Malley discharged his weapon at Kelley, Jr., because his life was in danger. (JA 808-812, 817-818, 824).    Rivotti discharged his weapon at Kelley, Jr., because Kelley, Jr., posed a threat of death to O'Malley and others. (JA 754, 760-761, 768-769).

## SUMMARY OF THE ARGUMENT

The District Court correctly granted summary judgment in favor of Defendants O'Malley and Rivotti.  Plaintiffs have failed to identify any record evidence of a contradiction or genuine dispute of fact that Kelley, Jr., with knife in hand, made a movement in the direction of O'Malley who was standing approximately eight feet away when he and Rivotti opened fire.  No reasonable jury could conclude that at that moment Kelley, Jr., who had assaulted two police officers at the start of the encounter, was armed with a knife, was resisting arrest and attempting to escape, had violently stabbed a police K-9 multiple times, and was advancing towards O'Malley with uplifted knife from eight feet away, did not pose an immediate threat to O'Malley's life, thereby justifying the use of lethal force against Kelley, Jr.

Plaintiffs have failed to identify any other disputed material facts of record which were allegedly overlooked by the District Court.  Plaintiffs' citation to other purportedly material and controlling facts provides no basis for this Court to alter the District Court's conclusions here.  Plaintiffs have not shown material error in the District Court's determination of the facts here.

The District Court properly determined that based on the record evidence, O'Malley and Rivotti are entitled to qualified immunity.  Plaintiffs have failed to show that Kelley, Jr., suffered a violation of a clearly established constitutional right

under the second prong of the qualified immunity analysis. Plaintiffs have not identified any case law remotely analogous to the facts of this occurrence to demonstrate that O'Malley and Rivotti violated a clearly established right on January 31, 2016. Plaintiffs' attempt to cast this case as an "obvious" violation of Kelley, Jr.'s constitutional rights under <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985) and <u>Graham v. Connor</u>, 490 U.S. 386 (1989) must fail as O'Malley was faced with a serious threat of violence and immediate harm from Kelley, Jr., which clearly distinguishes this case from an "obvious" case. Accordingly, Plaintiffs have failed to show that the District Court's qualified immunity analysis was in error.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY FOUND THE FACTS WHEN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS O'MALLEY AND RIVOTTI.

### A. Standard Of Review

This Court's review of a grant of summary judgment is plenary; and in conducting its review, the Court is to use the same standard as the District Court – whether genuine issues of material fact exist that preclude entry of summary judgment. Acumed LLC. V. Advanced Surgical Services, Inc., 561 F.3d 199 (3d Cir. 2009).

### B. Legal Standards at Issue

#### i. The Use of Deadly Force

As set forth above, Plaintiffs claim that O'Malley and Rivotti are civilly liable for their alleged use of excessive force in the fatal shooting of Kelley, Jr. See pages 2-3, supra. When reviewing a grant of summary judgment in favor of law enforcement for such a claim, this Court has stated as follows:

> Before proceeding, it is necessary to clarify our Fourth Amendment standard in deadly-force cases. Following the Supreme Court's lead in *Tennessee v. Garner*, we have previously suggested that an officer's use of deadly force is justified under the Fourth Amendment only when (1) the officer has reason to believe that the suspect poses a 'significant threat of death or serious physical injury to the officer or others.' and (2) deadly force is necessary to prevent the suspect's escape or serious injury to others. In *Scott v. Harris*, however, the Supreme Court clarified that

15

'*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute deadly force'' Rather, *Garner* was 'simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation.' Scott abrogates our use of special standards in deadly-force cases and reinstates 'reasonableness' as the ultimate – and only – inquiry. 'Whether or not [an officer's] actions constituted application of 'deadly force,' all that matters is whether [the officer's] actions were reasonable.' This is not to say that the considerations enumerated in *Garner* are irrelevant to the reasonableness analysis; to the contrary, in many cases, including this one, a proper assessment of the threat of injury or the risk of flight is crucial to identifying the magnitude of the governmental interest at stake. But such considerations are simply the means by which we approach the ultimate inquiry, not constitutional requirements in their own right.

The reasonableness of a seizure is assessed in light of the totality of the circumstances. We analyze this question 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,' making 'allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

Johnson v. City of Philadelphia, et. al., 837 F.3d 343, 349-50 (3d Cir. 2016).

The Court has further explained:

Because "the victim of deadly force is unable to testify," *Abraham v. Raso,* 183 F.3d 279, 294 (3d Cir.1999), we have recognized that a court ruling on summary judgment in a deadly-force case "should be cautious ... to 'ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story—the person shot dead—is unable to testify,' " *id.* (quoting *Scott v. Henrich,* 39 F.3d 912, 915 (9th

16

Cir.1994)). Thus, a court should avoid simply accepting " 'what may be a selfserving account by the officer[s]. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.' " *Id.* (quoting *Scott,* 39 F.3d at 915).

This is not to say that the summary judgment standard should be applied with extra rigor in deadly-force cases. Rule 56 contains no separate provision governing summary judgment in such cases. *Cf. Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1396 (7th Cir.1997). Just as in a run-of-the-mill civil action, the party opposing summary judgment in a deadly-force case must point to evidence—whether direct or circumstantial—that creates a genuine issue of material fact, "and may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account." *Estate of Smith v. Marasco,* 318 F.3d 497, 514 (3d Cir.2003); *see Thompson v. Hubbard,* 257 F.3d 896, 899–900 (8th Cir.2001); *Elliott v. Leavitt,* 99 F.3d 640, 644 (4th Cir.1996); *Williams v. Borough of W. Chester,* 891 F.2d 458, 460–61 (3d Cir.1989). Our conclusion on this score is reinforced by decisions refusing to ratchet up the summary judgment standard for other types of cases. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505 (defamation cases requiring a showing of malice); *Wallace,* 103 F.3d at 1396 (employment-discrimination cases); *Texaco P.R., Inc. v. Medina,* 834 F.2d 242, 247 (1st Cir.1987) (antitrust cases); *see also Gordon v. United Airlines, Inc.,* 246 F.3d 878, 896 (7th Cir.2001) (Easterbrook, J., dissenting) ("[Rule 56 prescribes] a universally applicable standard; there is no room for a thumb on the scale against summary judgment in any class of cases.")

Lamont v. New Jersey, 637 F.3d 177, 181-82 (3d Cir. 2011).

### ii.    Qualified Immunity

The doctrine of qualified immunity, if applicable, will protect officers from liability.  "Qualified immunity has two prongs. First, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right. And second, the court must determine whether the right at issue was clearly established at the time of defendant's alleged misconduct."  James v. New Jersey State Police, 957 F.3d 165, 168 (3d Cir. 2020) (quotation marks and citations omitted) (alterations in original).  Courts may begin their analysis with either prong.  Ids.

Regarding the second prong, i.e., the prong at issue here, see page 46-49, infra, this Court has explained:

> Qualified immunity's second prong 'shields officers from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'' Mullenix v. Luna, ___U.S.__, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (quoting Pearson, 555 U.S. at 231, 129 S.Ct. 808).

> 'Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful.' District of Columbia v. Wesby, U.S.__,   138 S.Ct. 577, 589, 199 L.Ed.2d 453 (2018) (internal quotation marks and citation omitted). The inquiry is an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs…are irrelevant.' Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Because the inquiry is from the perspective of a reasonable officer, we 'consider [] only the facts that were knowable to the defendant officer [].' White v. Pauly, _U.S.__,   137 S.Ct. 548, 550, 196 L.Ed.2d 463 (2017) (citation omitted).

In rare cases, a plaintiff may show that a right is clearly established if the 'violation [is] 'obvious.' ' *See Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (quoting *Hope v. Pelzer*, 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). In the excessive-force context "obvious cases" are those that obviously violate *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). *See Brosseau*, 543 U.S. at 199, 125 S.Ct. 596. '[*Graham*] clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.' *Id.* at 198, 125 S.Ct. 596 (citation omitted). And *Garner* held that '[deadly] force may not be used unless it is necessary to prevent ... escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' 471 U.S. at 3, 105 S.Ct. 1694.

But in most cases, a plaintiff must show that a right is clearly established because 'the violative nature of *particular* conduct [was] clearly established.' *Ziglar v. Abbasi*, —— U.S. ——, 137 S. Ct. 1843, 1866, 198 L.Ed.2d 290 (2017) (quoting *Mullenix*, 136 S. Ct. at 308). In other words, "settled law," *Wesby*, 138 S. Ct. at 590, must ' 'squarely govern[ ]' the specific facts at issue,' *see Kisela v. Hughes*, —— U.S. ——, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (quoting *Mullenix*, 136 S. Ct. at 309). The Supreme Court has explained that a plaintiff may satisfy this standard by 'identify[ing] a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the [constitutional provision at issue].' *White*, 137 S. Ct. at 552.

For qualified-immunity purposes, 'clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a 'robust consensus of

cases of persuasive authority in the Courts of Appeals.'' *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018) (citation omitted); *see Wesby*, 138 S. Ct. at 589–90 ('To be clearly established, a legal principle must ... [be] dictated by controlling authority or a robust consensus of cases of persuasive authority[.]' (citations and internal quotation marks omitted)). So we first look to factually analogous precedents of the Supreme Court and the Third Circuit. *See L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247–48 (3d Cir. 2016). Then, we examine persuasive authorities, such as our nonprecedential opinions and decisions from other Courts of Appeals. *See id.* We may consider all relevant cases under this inquiry, not just those cited by the parties. *See Elder v. Holloway*, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994).

Id. at 169-70

The Supreme Court has also stated:

The doctrine of qualified immunity shields officials from civil liability so long as their conduct ' 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' ' *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' *Reichle v. Howards*, 566 U.S. ___, ____, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and alteration omitted). 'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' *Ashcroft .v al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

'We have repeatedly told courts…not to define clearly established law at a high level of generality.' *al-Kidd, supra,* at 742, 131 S.Ct. 2074. The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.' *Ibid.* (emphasis added). This inquiry ' 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'' *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.' 533 U.S., at 205, 121 S.Ct. 2151.

Mullenix v. Luna, 577 U.S. 7, 11-12 (2015).

This Court, furthermore has stated:

The Supreme Court stressed that the qualified immunity question must be resolved 'at the earliest possible stage in the litigation.' *Id.* at 2156 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam)). 'Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'' *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. at 526, 105 S.Ct. 2806 (1985)). 'The privilege is 'an immunity from suit rather than a mere defense to liability, and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'' *Id.*

Bennett v. Murphy et al., 274 F.3d 133 136 (3d Cir. 2002). Indeed, this Court has

reminded the district courts that "[q]ualified immunity, after all, protects even those

officials who exercise extraordinarily poor judgment." <u>Savers v. Borough of Nesquehoning</u>, 905 F.3d 711, 719 (3d Cir. 2018) (citing <u>al-Kidd</u>, 563 U.S. at 743).

### iii.    District Court Conclusions

The District Court found that no genuine dispute of fact exists that Kelley, Jr., and O'Malley were standing approximately eight feet from one another when O'Malley and Rivotti opened fire, and Kelley, Jr., made a forward movement towards O'Malley just before the shooting. (Appellants' Appendix to Principal Brief p. 37).   Based on these findings the District Court concluded that O'Malley and Rivotti were entitled to the protections of qualified immunity. (Appellants' Appendix to Principal Brief pp. 37-39).

Plaintiffs now challenge the District Court's conclusions.  They contend first that the District Court erred in its factual analysis.  For the reasons that follow immediately below and in Argument II, Plaintiffs' factual arguments fail.

### C.    Discussion

#### i.    Despite Plaintiffs' Contentions To The Contrary, Kelley, Jr., Made A Movement In The Direction Of O'Malley And There Was No Genuine Dispute Of Material Fact As To The Same.

In their attempt to convince this Court to reverse the District Court's grant of summary judgment in favor of O'Malley and Rivotti, Plaintiffs contend that genuine issues of material fact existed regarding whether Kelley, Jr., moved toward O'Malley before O'Malley and Rivotti opened fired. (Appellants' Principal Brief

pp. 63-69).  To support their contention, Plaintiffs advance eight arguments.  Those arguments fail.

*First*, Plaintiffs assert that O'Malley materially contradicted himself on the issue of whether or not Kelley, Jr., moved towards him with knife in hand.  Plaintiffs seek to support this argument by comparing the video recorded interview of O'Malley on February 2, 2016, by the Allegheny County Police, (JA 481), with O'Malley's deposition testimony, (JA 188).  With respect to the former, O'Malley was questioned for approximately 20 minutes by Allegheny County Police detectives.  In describing the apprehension by Police K-9 Aren, O'Malley stated: "And then when Aren went from two legs to four legs - - he's now off the bite - - I could see him now spinning.  Now he's - - now he's now progressing back towards us and he's just, like, thrusting at him at my dog." (JA 497).  O'Malley continued: "And that's when I - - I saw him.  I mean, his arm was out, and he - - now he spun towards us.  And from where I was now, that's when I just - - I took my pistol out, and I just - - I just fired." (JA 498).

During his approximately four-hour videotaped deposition conducted on October 7, 2020, O'Malley stated: "He (Police K-9 Aren) started back in for an apprehension - - apprehension.  And that's when the suspect, with the knife, came upwards under his jaw and started just thrashing up - - upwards."  O'Malley continued: "So then once - - after he's done stabbing Aren, he spins towards me and

takes a step with his knife, with the knife. And that's when I drop my leash and unholster my gun and - - and fire." (JA 279). Further, O'Malley stated: "I said he raised the knife and stepped towards me and that's when I unholstered and fired." (JA 280).

Thus, contrary to Plaintiffs' argument, O'Malley's interview statement and his deposition testimony are not in contradiction. There is no genuine dispute of material fact in comparing the interview statement and the deposition testimony. Both statements can be true simultaneously. The deposition testimony simply provides more – but not contradictory – information than the interview statement.

Notably, Plaintiffs submit no similar argument comparing the Allegheny County Police interview of Rivotti to Rivotti's deposition testimony. Like O'Malley, Rivotti provided a video recorded interview statement to the Allegheny County Police on February 2, 2016 (JA 512). Therein, Rivotti stated,

> And that's when he (Kelley, Jr.) actually started taking steps towards - - more towards Sergeant O'Malley than myself. But he took about - - almost two full steps at Sergeant O'Malley. And on the third one is whenever he - - he slammed the knife into K-9 Aren. And that's when I saw - - the knife actually went into - - like, went down into his throat, and he had stabbed him. And at that time, he was still progressing towards K-9 Sergeant O'Malley. That's when K-9 Sergeant O'Malley, I believe, began to fire.

(JA 528).

In his deposition, Rivotti testified,

After that, Kelley is pretty much facing directly at Sergeant O'Malley. Aren disengaged. Kelley took about two steps towards Sergeant O'Malley. K-9 Aren attempted to reengage. And as K-9 Aren's head was coming up to reengage again, Kelley took the knife and stabbed it into K-9 Aren's throat and continued in the direction of K-9 Sergeant O'Malley.

Rivotti continued:

He was slashing - - he was slashing at Aren. As he was taking the steps forward, Aren came up to attempt to engage again. And then Kelley stabbed the knife into Aren's throat area. And then after that is when K-9 Aren fell to the ground. And he - - he was continuing towards Sergeant O'Malley with the knife in his right hand. His knife was out in front of him, facing K-9 Sergeant O'Malley.

(JA 403).

Rivotti then had the following exchange with Plaintiffs' counsel:

Q. And when does Kelley take two steps towards O'Malley? A. After he - - as he spun around, after K-9 Aren disengaged, he took the steps towards K-9 Sergeant O'Malley and was slashing the knife at K-9 Aren. And then K-9 Aren attempted to make the second - - reengage the second time. And then that's when he slashed - - he stabbed K-9 Aren again in the throat. - - - As soon as K-9 Aren hit the ground, K-9 Aren started towards my left. And that is when I fired my weapon.

(JA 404).

Based on the above, no contradiction exists between O'Malley's deposition testimony and his video recorded statement to police investigators. Additionally, consistent information provided in the former does not establish a contradiction with the latter.

*Second*, Plaintiffs argue that the testimony of Swissvale Police Sergeant William Hahn conducted on November 5, 2020, (JA 1220), contradicts O'Malley and Rivotti on whether Kelley, Jr. advanced towards O'Malley prior to being shot. Sergeant Hahn was part of the group of police officers in pursuit of Kelley, Jr. Sergeant Hahn stated that he had just come out from between houses at the moment of the gunfire.  According to Sergeant Hahn:

> …I did not see Officer O'Malley until I doubled back along the subject, who now at this point was out of my view.  And I was hearing the commands for the K-9 to be released."  "That's when I came out from between the houses.  And at that time is when the gunfire started."  "I was walking up, I believe, between the houses.  So at this point, I did not see the dog or - - Lieutenant O'Malley, I believe it is now, at that time.  And when I came out, that's when the subject had stabbed the dog.

(JA 1238).

Sergeant Hahn continued: "…I had just come out between two houses.  The male was across the street and down the street, I'd say, one house.  And I was behind Officer O'Malley and his K-9, who was much closer to the subject than I was." (JA 1239).  Sergeant Hahn testified as follows:

> Q. Did you see O'Malley release the dog?  A. I did not.  Q. Okay.  So the first time you see the dog, where is the dog? A. He's - - the subject had him and was stabbing him.  Q. And where was the subject?  A. He was in the front yard of Whitney Avenue as you described.  It was right in the front yard, near the sidewalk, between the porch and the sidewalk.

(JA 1241).

26

In addition, Sergeant Hahn said: "I just heard a real quick few shots go off - - maybe four or five or six - - and the subject dropped.  That's when I ran over with another officer." (JA 1242).  He explained further:

> I literally came out around the corner as the dog was being stabbed and the gunshots occurred.  And they were - - they were a second apart.  So I relied - - I was still gaining my field of vision, I guess you would say, with the layout of what was going on when that all occurred.  And then that's when I went to the subject and assisted in placing him into handcuffs.

(JA 1248).

The testimony of Sergeant Hahn, therefore, in no way contradicts the statements and testimony of O'Malley and Rivotti.  He never testified that Kelley, Jr., did **NOT** move or advance towards O'Malley.  His testimony provides no basis to reverse the District Court's grant of summary judgment here.

***Third***, Plaintiffs argue that O'Malley and Rivotti started shooting at Kelley, Jr., when Police K-9 Aren was in the midst of attempting to apprehend him.  This argument was not raised by Plaintiffs in the District Court and thus is waived. Tabron v. Grace, 6 F.3d 147 (3d Cir. 1993).  Furthermore, a review of the record shows the sequence of events from releasing Police K-9 Aren for the apprehension through the shooting of Kelley, Jr., all occurred in a matter of ten seconds. (JA 821-822).  This was a fluid and rapidly evolving situation.  No record evidence exists that O'Malley and Rivotti discharged their weapons at Kelley, Jr., while Police K-9 Aren was in

their line of fire attempting the apprehension.  Plaintiffs, moreover, never direct this Court to such evidence.

**Fourth**, Plaintiffs argue that the deposition testimony of Wilkinsburg Police Officer Shawn Granger, (JA 1137), contradicts Rivotti and O'Malley on the issue of whether Kelly, Jr., advanced towards O'Malley.  Officer Granger said, "The dog went to apprehend…and at that point Bruce Kelley stuck the knife into the dog's throat." (JA 1185).  Officer Granger testified that it happened very quickly; and after the dog was stabbed, the shots were fired.  Indeed, consider the following exchange from Officer Granger's deposition: "Q. How much time elapsed - - I know you're not thinking of it in that moment but looking back, in between the dog gets stabbed and the first shot is fired?  A. Seconds." (JA 1189).

Accordingly, Officer Granger's testimony in no way contradicts the testimony of O'Malley and Rivotti.  They opened fire after Kelley, Jr., stabbed Police K-9 Aren.  In addition and like Sergeant Hahn, Officer Granger never testified that Kelley, Jr., did **NOT** advance or move towards O'Malley.

**Fifth**, Plaintiffs contend that the testimony of Port Authority Police Officer Andrew Kaupinis conducted on September 24, 2020 (JA 942) contradicts the statements and testimony of O'Malley and Rivotti concerning Kelly, Jr.'s movements.  Officer Kaupinis said: "After stabbed, the dog released, went back on,

was stabbed again.  Then released and ran away." (JA 1002). He continued to testify

as follows:

> A. That's when Bruce Kelley, Jr., then turned, held his knife up towards officers and started making forward motions towards Officer O'Malley. Q. So your report says 'Immediately after Kelley, Jr., stabbed K-9 Aren, he turned to face officers and made motions toward officers on scene.' Is that what your report said?  A. Yes.

(JA 1003).

Officer Kaupinis further testified:

> Q. After he stabbed - - after he stabs the dog, how is Kelley's body positioned?  A. He had turned back around towards officers at that point. Q. And in your report it says 'He turned to face officers and made motions toward officers on scene.' So describe, please, what motions he made.  A. That was raising the knife up and walking towards Sergeant O'Malley.

(JA 1004).

The report and testimony by Officer Kaupinis thus do not contradict the

testimony of O'Malley and Rivotti on the issue of Kelley, Jr.'s movements.

*Sixth*, Plaintiffs argue that the District Court ignored entirely the issue that the

police K-9's apprehension on the arm of Kelley, Jr., could be the reason why he

turned in the direction of O'Malley.  Plaintiffs contend that the movements by

Kelley, Jr., may have been involuntarily made and thus create a genuine dispute of

material fact.  This challenge is legally irrelevant.  See Johnson, 837 F.3d at 349-50

(focus of the inquiry is only the scene from the "perspective of a reasonable officer"

who is "often forced to make split-second judgments" in scenarios that "are tense,

uncertain, and rapidly evolving" (citations omitted)); see also Lamont, 637 F.3d at 181-82 (same and noting that "Monday morning quarterbacking is not allowed" in the analysis).  Plaintiffs, moreover, also cite to no law in support of this argument.

The record evidence, however, unequivocally proves that Kelley, Jr., made movements toward O'Malley during and after the apprehension attempt by Police K-9 Aren.  Whether some of those movements were made involuntarily does not change the circumstances before O'Malley and Rivotti:  Kelley, Jr., who had already viciously stabbed Police K-9 Aren repeatedly was – after his encounter with the K-9 officer had violently concluded – then facing and moving towards O'Malley with uplifted bloody knife in hand.  The law recognizes that police officers in like circumstances are required to make split second decisions which must be reviewed and evaluated in the moment.  See Johnson, 837 F.3d at 349-50; see also Lamont, 637 F.3d at 181-82.  The law does not permit second guessing or Monday morning quarterbacking.  Id.  The law does not require courts or the officers like O'Malley and Rivotti to assess whether some of Kelley, Jr.'s movements were caused by the actions of Police K-9 Aren.

**Seventh**, Plaintiffs assert that the District Court misconstrued information contained in two pieces of paperwork completed as a result of the incident. Allegheny County Homicide Detective Caruso completed an "Evidence Submittal Form".  (JA 594-595).   The form is preprinted with 10 numbered items of

30

information to be entered.  Item No. 6 is titled "Facts of Offense or Occurrence" and contains a small box for entry of information.  In that box, Detective Caruso wrote "Actor was involved in a physical altercation with a PATPD at first contact.  A foot pursuit ensued.  After multiple attempts to subdue actor with Tasers, a police K-9 was deployed on the actor.  The actor stabbed the K-9 prompting officers to open fire on the actor."  Id.  This writing completely fills the box in item No. 6.  It is clear that the form is used for inventory purposes of O'Malley's and Rivotti's firearms.  Plaintiffs contend, however, that because the information written in the box in item No. 6 does not mention that Kelley, Jr., made movements towards O'Malley, somehow a contradiction exists between the form and O'Malley's and Rivotti's testimony, leading to a purported genuine dispute of material fact.

Similarly, Detective Caruso completed another form titled "Mobile Unit: Fact Sheet/Request Form".  (JA 597-598).  Again, the form is preprinted with titled sections for the entry of information.  On the first page of the form near the bottom, (JA 597), there is a section with a box titled "Comments:".  In that box Detective Caruso wrote the following information:

> Victim was involved in a physical altercation with police at Wood Street and Franklin Ave.  The victim led officers on a foot pursuit where multiple less–than–lethal options where attempted to stop him.  A police dog was released on the victim, and the victim stabbed the police dog.  Officers subsequently opened fire on the victim.

Again, this written information completely fills the box on the form. This form documents the identity of those individuals participating in the collection of evidence and the times they were present on the scene. Plaintiffs make the same argument as above: because the form does not mention Kelley, Jr., making movements towards O'Malley, a contradiction between the form and Rivotti's and O'Malley's testimony exists and, therefore, so too does a genuine dispute of material fact.

Plaintiffs' arguments here lack merit. Based on the preprinted forms and the small sizes of the subject boxes allowing for very limited written information, it is clear that the forms are not intended for and do not allow for the entry of complete details of the factual occurrence. Those details are provided by other aspects of the Allegheny County Police Department's investigation, such as the video recorded statements taken of both O'Malley and Rivotti within days of the occurrence. Moreover, the handwritten notations in the boxes by Detective Caruso do not contradict O'Malley's and Rivotti's testimony. The handwritten notations in the boxes by Detective Caruso and the testimony by the defendant officers can be true simultaneously with the latter providing additional – but not contradictory – information.

**_Finally_**, Plaintiffs argue that the primary issue of the Allegheny County Police Department to be investigated was whether or not the shooting was justified, and

because the above discussed report forms did not mention Kelley, Jr., moving towards O'Malley creates a genuine dispute of material fact overlooked by the District Court.  Again, Plaintiffs fail to point to anything in the record pertaining to this argument that creates a genuine dispute of material fact.  The issue before this Court is whether O'Malley and Rivotti are entitled to qualified immunity as granted by the District Court.  The manner in which the Allegheny County Police Department detectives completed their forms used in this investigation is irrelevant.  As discussed above, the absence of such information from the report forms completed by the investigating police is not a contradiction of the material facts and does not create a genuine dispute of material facts.  Whether or not the Allegheny County Police detectives did an incomplete job in filling out the evidence forms after the shooting does not mean that O'Malley and Rivotti are not entitled to qualified immunity based on the facts and circumstances presented immediately prior to the shooting.

In summary, the record contains no contradictions of the statements and testimony by O'Malley and Rivotti of Kelley, Jr.'s movements/progression towards O'Malley with knife in hand.  No reasonable jury could conclude that at that moment Kelley, Jr., – who  had assaulted two police officers at the start of the encounter, was armed with a knife, was resisting arrest and attempting to escape, had violently stabbed a police K-9 multiple times, and was advancing towards O'Malley with

uplifted knife from eight feet away, did not pose an immediate threat to O'Malley's life, thereby justifying the use of lethal force against Kelley, Jr.

> ### ii. The District Court Correctly Concluded That No Genuine Dispute Of Fact Existed As To The Distance Between O'Malley And Kelley, Jr., At The Time Shots Were Fired.

Plaintiffs assert that genuine issues of material fact existed as to the distance between O'Malley and Kelley, Jr., at the time O'Malley and Rivotti discharged their weapons. On this issue, Plaintiffs contend the following two allegations reveal the factual dispute: (i) Kelley, Jr.'s movements and position were involuntarily influenced by the apprehension of the police K-9 and (ii) O'Malley's inability to mark his own and Kelley, Jr.'s locations on an overhead satellite Google Earth image of the scene used by Plaintiffs' counsel at O'Malley's deposition. Plaintiffs' arguments lack merit. There is no genuine factual dispute as to the distance between Kelley, Jr., and O'Malley at the time of the shooting.

O'Malley testified during his deposition that he concealed himself behind a bush across the street from 710 Whitney Avenue as he heard Kelley, Jr., approaching on the street. (JA 494, 794-798). Kelley, Jr., was walking diagonally along Whitney Avenue towards the dead end and busway and angling towards the house at 710 Whitney Avenue. (JA 492, 794-798). O'Malley stepped out from the bush and gave his warnings to Kelley, Jr., to stop, drop the knife or he was going to release the K-9. (JA 800). Kelley, Jr., ignored the warnings. (JA 495). O'Malley stated that he

was about ten yards away from Kelley, Jr., when he released Police K-9 Aren who then took off at Kelley, Jr., to make the apprehension. (JA 495, 798).  O'Malley testified that he took several steps closer towards Kelley, Jr., while Aren was making the apprehension so that O'Malley would be able to assist with his hands and body to complete the take down and apprehension of Kelley, Jr. (JA 807, 821).  O'Malley then observed Kelley, Jr., repeatedly stabbing Police K-9 Aren in the neck and jaw area. (JA 497, 805-808).  O'Malley's gun was still holstered at this time. (JA 801, 821).  O'Malley stated: "So then once - - after he's done stabbing Aren, he spins towards me and takes a step with his knife, with the knife.  And that's when I drop my leash and unholster my gun and - - and fire." (JA 279).  O'Malley continued:  "I said he raised the knife and stepped towards me.  And that's when I unholstered and fired." (JA 280).  O'Malley testified that he was in the street at that time, (JA 280), and Kelley, Jr., was eight feet from him moving towards him, (JA 282-283).  The total time that elapsed from when O'Malley unleashed Police K-9 Aren until he fired his weapon and Kelley Jr., fell to the ground was ten seconds. (JA 821-822).

The Allegheny County Office of the Medical Examiner ("OME") conducted an investigation of the occurrence by gathering all evidence at the scene, photographing and mapping its location. (JA 1335-1650).  In their investigation of the scene, the OME recorded locating 11 shell casings and marked their locations on an inventory log and scene diagram. (JA 1622-1647; specifically 1626).  All of the

shell casings were located in and around the front yard of 710 Whitney Avenue where Kelley, Jr., was shot. (JA 1376-1454, 1535-1550, 1585-1646).  All of the shell casings are no more than several feet from Kelley, Jr.'s body. (JA 1626).  The photographs and mapping location of the shell casings corroborate the proximity of O'Malley and Rivotti to Kelley, Jr., when they discharged their weapons. (JA 1376-1454, 1535-1550, 1585-1646).  The dog leash dropped by O'Malley was found in the street just to the west of 710 Whitney Avenue which corroborates the testimony by O'Malley and his proximity to Kelley, Jr., when he discharged his weapon. (JA 1382-1383, 1618, 1626).

The testimony by Officer Kaupinis is consistent with the testimony by O'Malley.  Kaupinis estimated that O'Malley was standing in the street and was approximately 35 feet away from Kelley, Jr., when O'Malley gave the warnings to Kelley, Jr., that he was going to release his K-9. (JA 995-997).  Kaupinis stated that he estimated O'Malley was 15 to 20 feet from Kelley, Jr., when he released the police K-9. (JA 1005).  Kaupinis testified that after O'Malley released K-9 Aren, O'Malley then moved towards Kelley, Jr. (JA 1000).

During O'Malley's deposition, Plaintiffs' counsel asked him to mark on an overhead Google Earth photograph of Whitney Avenue, (JA 1332), the location of himself and Kelley, Jr., at the time of the shooting.  O'Malley answered that he was unable to do so due to the photo.  O'Malley explained that the photo was far away,

has shadows, it was a different time of year, and is not a fair representation of the scene. O'Malley explained that he would be guessing if he tried to mark the Google area photo used by Plaintiffs' counsel for the question. (JA 272, 284, 286). Upon examination of the Google Earth aerial photograph it is evident that it is of poor quality, from a great distance, with an obstructed view, and does not identify which house is 710 Whitney Avenue, all of which rendered it impossible for O'Malley to make the requested markings. Notably, Plaintiffs counsel had available a multitude of scene photographs clearly depicting the subject area of the shooting, in color, and up close which would have been much more reasonable to use, (JA 1376-1584), but he failed to use them to elicit a response to his questions.

Accordingly, no genuine issue of material fact exists as to the distance between O'Malley and Kelley, Jr., at the time of the shooting. Plaintiffs have not identified any record evidence contradictory to the District Court's finding that O'Malley was approximately eight feet from Kelley, Jr., when he discharged his weapon.

### iii.    Conclusion

The above makes clear that Plaintiffs have not cast doubt on the District Court's conclusions (i) that Kelley, Jr., made a movement towards O'Malley after violently stabbing K-9 Aren and (ii) that O'Malley and Kelley, Jr., were

approximately eight feet apart when the shooting began.  No genuine dispute of fact exists as to those findings.

## II.    THE DISTRICT COURT PROPERLY CONSIDERED OTHER MATERIAL FACTS OF RECORD.

Plaintiffs also assert the District Court wrongly granted summary judgment because it overlooked a litany of other purportedly material facts that were allegedly in dispute.  In an attempt to support their position, Plaintiffs, with little analysis, have provided this Court with a list of such "facts".  Nothing identified by Plaintiffs compels this Court to alter the District Court's ruling.

*First*, Plaintiffs argue that the District Court overlooked Kelley, Jr.'s mental illness which they contend goes directly to the reasonableness of the use of force in deploying the police K-9 and shooting Kelley, Jr.  Notably, Plaintiffs cite to no case law in support of their argument that a suspect who may have mental illness must be treated differently with regard to the use of force by police officers.  The legal standard is the same whether or not the suspect may or may not be considered to be mentally ill – the standard is reasonableness.  The reasonableness of the police officers' actions is a pure question of law.  Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1789, (2007).

Plaintiffs' argument is thus irrelevant and furthermore not supported by the record.  When questioned by Plaintiffs' counsel during their depositions, not a single police officer testified that he or she believed Kelley, Jr., was mentally ill based on

the encounter. (JA 306, 414, 866, 1041, 1123, 1150, 1231-1232, 1264, 1293).  The

pursuing police officers repeatedly attempted to deescalate the situation by giving

countless verbal commands to Kelley, Jr., to comply, which he refused and ignored.

Plaintiffs point to only one limited answer from Officer Hahn in his deposition when

he stated: "At one point in time, I knew we were having an issue or whatever issue

with – you know – whether it was a psychological issue or whatever issue he may

be having, because he just didn't – he just wasn't' responding to any commands."

(JA 1230).  This testimony has no legal relevance to the reasonableness of the

deployment of lethal force by O'Malley and Rivotti.  The analysis of reasonableness

is an objective test based on the circumstances presented to the officers in question.

Notably, the fact that officers may be mistaken in considering a particular

individual – even one with mental illness – to be a threat to themselves or others will

not bar qualified immunity as a defense, provided that the mistake is reasonable

under the circumstances.  An example of this principle is the decision of Blanford v.

Sacramento County, 406 F.3d 1110 (9th Cir. 2005), where the officers who shot a

schizophrenic man carrying a sword, rendering him a paraplegic, after he appeared

to be ignoring their orders to drop the blade and attempted to enter a house, were

entitled to qualified immunity.  They did not know he could not hear their orders or

that he was attempting to enter his own home.

**Second**, Plaintiffs assert that the District Court failed to address the two shots that entered Kelley, Jr.'s back.  Again, Plaintiffs cite to no legal precedent holding as a matter of law that the fact that a police officer shoots a suspect in the back constitutes an unreasonable use of lethal force.

Moreover, the record evidence demonstrates the trajectory of the bullets in this case, which was not improper, based on the sequence of events.  O'Malley and Rivotti were not side by side when they discharged their weapons.  Rather, they faced Kelley, Jr., from different angles.  Rivotti was following Kelley, Jr., from behind along Whitney Avenue. (JA 741, 744).  O'Malley approached Kelley, Jr., from the opposite side of the street as he stepped onto Whitney Avenue when he deployed Police K-9 Aren for an apprehension. (JA 748, 798-801, 995-997).  Rivotti testified that as he faced Kelley, Jr., O'Malley was to his right. (JA 748-749).  Although Rivotti could not state precisely how far O'Malley was from him, he explained that O'Malley was in his peripheral vision but his focus was on Kelley, Jr., with knife in hand while violently stabbing Police K-9 Aren. (JA 742, 746, 748).  Both O'Malley and Rivotti explained in detail that during the apprehension by Police K-9 Aren, Kelley, Jr., spun around while violently stabbing Police K-9 Aren after which Kelley, Jr., moved directly towards O'Malley. (JA 750-752, 805-809).  Based on the record evidence, O'Malley was likely at a forty-five-degree angle from Rivotti when they discharged their weapons.  With Kelley, Jr., approaching directly

towards O'Malley, Rivotti was looking at the right side and back area of the body of Kelley, Jr. (JA 753). The locations of the entry wounds indicated in the autopsy report are completely consistent with the positions of O'Malley, Rivotti, and Kelley, Jr., all of which are uncontradicted in the record. (JA 1647-1650).

**Third**, Plaintiffs argue the District Court failed to address the reasonableness of the deployment of Police K-9 Aren by O'Malley. The deployment of Police K-9 Aren by O'Malley was a means of last resort of non-lethal force to secure the apprehension of Kelley, Jr. (JA 815, 823-824). At the outset of the incident, Kelley, Jr., assaulted Port Authority Police Officers Thomas Adams and Emily Hampy. (JA 840-846, 857-860, 888, 895-899, 900-902, 936-937, 1145-1146). Subsequently, and on multiple occasions, Kelley, Jr., swung his knife and pointed it in the direction of the officers who were attempting to arrest him. (JA 723, 731-732, 736, 745-747, 853-856, 918-920, 955-957, 966, 978-979, 1014-1015, 1037-1040, 1065, 1111-1113, 1131, 1135-1136, 1234-1236, 1268, 1289-1291, 1305, 1317-1334, DCD No. 120-1 at Q and R). At one point, when Port Authority Police Officer Kyhnroe Sanders attempted to use his ASP baton to strike the arm/hand of Kelley, Jr., in the hope of knocking the knife to the ground, Kelley, Jr., turned around, apparently sensing Officer Sanders' approach, and swung the knife directly at Officer Sanders. Fortunately, Officer Sanders jumped back, dodging Kelley, Jr.'s assault. (JA 966, 978-979, 1037-1040, 1234-1236, 1317-1334, DCD No. 120-1 at R - videotape).

The pursuing police officers, including Rivotti and O'Malley, gave countless verbal commands to Kelley, Jr., to stop, to drop the knife, to get on the ground, etc. (JA 841, 846-855, 900, 923, 935-936, 957, 975, 1037, 1066-1067, 1108-1116, 1119-1120, 1151, 1157, 1169, 1171, 1173, 1227, 1249, 1266, 1290-1291).  Kelley, Jr., heard the commands and responded to the same by turning towards the officers pursuing him, shouting profanities and swinging his knife.  He refused to cooperate. (JA 723, 731-733, 736-738, 745-747, 763-768, 955-957, 1014-1017, 1038, 1055, 1064-1070, 1092, 1107-1122, 1131, 1135-1136, 1155, 1173, 1192, 1268-1270, 1289-1293, 1305, 1317-1334).  The pursuing officers used multiple deployments of less than lethal force, including numerous deployments of OC (pepper spray), numerous deployments of Tasers, deployment of an ASP baton, and finally the deployment of Police K-9 Aren. (JA 497, 527-528, 747-750, 801-802, 805, 846-849, 863-864, 966-987, 1001-1002, 1037-1040, 1066-1075, 1155-1159, 1170-1173, 1184-1185, 1234-1237, 1249, 1289, 1291, 1295, 1317-1334, DCD No. 120-1 at R - videotape).  All available methods of non-lethal force had been attempted and exhausted prior to the deployment of Police K-9 Aren.

O'Malley testified that at the time he decided to deploy Police K-9 Aren, he was fully aware of the multitude of attempts at non-lethal force used by other officers to secure and apprehend Kelley, Jr.  He said he was aware of these efforts from the radio transmissions that he was hearing during the pursuit. (JA 316).  Furthermore,

the deployment of Police K-9 Aren was not the proximate cause of the use of lethal force by O'Malley and Rivotti. Rather, those officers discharged their firearms at Kelley, Jr., because he moved towards O'Malley with uplifted bloody knife in hand from approximately eight feet away after violently stabbing Police K-9 Aren.

**Fourth**, Plaintiffs contend that the District Court overlooked the zero attempts by O'Malley and Rivotti to deescalate the situation. This is ludicrous. As recited above, every single available means of less than lethal force was deployed on a multitude of occasions in an attempt to deescalate the situation. This is in addition to the countless number of verbal commands given to Kelley, Jr., to stop, drop the knife, and surrender, which he heard and responded to with profanity and turning towards the pursuing police officers and thrashing his knife in their direction. Rivotti participated in the foot pursuit, observed these deployments of less than lethal force, and gave numerous verbal commands himself to Kelley, Jr., in an effort to deescalate the situation. (JA 763, 1293). O'Malley heard about the multitude of less than lethal force attempts on Kelley, Jr., and he also gave a verbal command and warning to Kelley, Jr., prior to releasing Police K-9 Aren for an apprehension. (JA 800, 815, 823-824).

**Fifth**, Plaintiffs argue the District Court overlooked Rivotti's and O'Malley's testimony that they did not complete reports that were identified in a Port Authority Police Policy Manual. Whether or not the defendant officers completed reports after

43

the fact is irrelevant.   Plaintiffs fail to identify any case law to support this contention.   Furthermore, both O'Malley and Rivotti answered in their depositions and explained that they were unfamiliar with one of the report forms about which they were being questioned.   They also explained that it was their understanding and belief that by submitting to recorded interviews with the Allegheny County Police Department that such interviews constituted reports of the occurrence. (JA 297-300, 387-392).

*Sixth*, Plaintiffs allege that the District Court failed to consider as a material fact that at no time during the approximate twenty-minute foot pursuit that Kelley, Jr., threatened an officer or civilian with violence.   This is unequivocally false.   At the beginning of the police encounter with Kelley, Jr., when questioned by Port Authority Officers Adams and Hampy, Kelley, Jr., physically assaulted both of them. (JA 857-860, 936-937, 1145-1146).   Kelley, Jr., then forcibly resisted arrest and fled the scene on foot which led to the ensuing pursuit by numerous police officers. (JA 846-857, 918-920, 935-936, 1142).   During the pursuit, Kelley, Jr., repeatedly used profanities toward the officers and thrashed and swung his knife at the officers as they continued to follow him. (JA 723, 731-732, 736, 737-738, 746-747, 955-957, 1014-1015, 1038, 1065, 1066-1067, 1108-1112, 1111-1113, 1118-1120, 1155, 1173, 1192, 1268, 1289-1291, 1293, 1305, 1317-1334; DCD No. 120-1 at Q and R – videotape).   When Officer Sanders attempted to approach Kelley, Jr.,

with his ASP baton in an attempt to strike the hand/arm of Kelley, Jr., to knock the knife out of his hand, Kelley, Jr., immediately swung around and slashed his knife at Officer Sanders who fortunately jumped back quickly to avoid being struck. (JA 1317-1334, DCD No. 120-1 at R - videotape). Additionally, the police officers testified that there were numerous civilians, including children in the area of the streets of Wilkinsburg where Kelley, Jr., was attempting to escape from the officers. (JA 722-726, 868, 938-939, 962-963, 1011, 1019, 1034, 1052-1053, 1114-1116, 1132, 1197-1199, 1227-1229, 1250-1252, 1277-1278, 1298, 1304).

*Finally*, Plaintiffs argue that Kelley, Jr., was completely surrounded by police and unable to escape at the time O'Malley and Rivotti used lethal force. This is absolutely false and unsupported by the record. Plaintiffs cite only to the deposition testimony of Officer Kaupinis and no other evidence. A review of the testimony by Kaupinis cited by Plaintiffs includes nothing more than a statement about the location of the pursuing officers being on the front side of the house on Whitney Avenue as opposed to being behind the house. Kaupinis testified that all of the officers were following Kelley, Jr., from behind. (JA 1015-1019). Every police officer in pursuit that testified on this issue stated that the officers were always behind Kelley, Jr., following him, and Kelley, Jr., had a clear path ahead of him to continue his attempt to escape, including at the time of the shooting. (JA 767, 1018-1019, 1055, 1170, 1194-1195).

Accordingly, Plaintiffs' citation to other purportedly material and controlling facts provides no basis for this Court to alter the District Court's conclusions here. Plaintiffs have not shown material error in the District Court's determination of the facts here.

## III.   THE DISTRICT COURT PROPERLY DETERMINED THAT BASED ON THE FACTS PRESENTED HERE, O'MALLEY AND RIVOTTI ARE ENTITLED TO QUALIFIED IMMUNITY.

As noted above, the District Court concluded that Rivotti and O'Malley are shielded from liability based on the doctrine of qualified immunity.  According to the District Court, Plaintiffs did not show that Kelley, Jr., suffered the violation of a clearly established constitutional right (prong two of the qualified immunity analysis), stating as follows:

> Now that the Court has determined that no genuine issue of fact exists about the distance between Kelley and O'Malley and whether Kelley made a forward movement toward O'Malley, it turns to defining the constitutional right at issue. Plaintiffs define the right as follows:
>
>> Kelley's 4th Amendment right under both *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham vs. O'Connor*, 490 U.S. 386 (1989) to be free from the seizure of his body by the use of deadly/excessive force when, looking at the facts in the light most favorable to the Plaintiffs, Kelley did not pose a (i) significant and (ii) immediate threat of death or serious bodily injury to either Defendant nor anyone else. (Docket No. 145 at 2).

Plaintiffs' definition of the right is too broad. As the Supreme Court has repeatedly explained, "[T]here is no doubt that *Graham v. Connor, supra,* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough." *Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (internal quotation marks and citation omitted). Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotations marks and citation omitted). Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotations marks and citation omitted). Said another way, defining the right "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 198 (internal quotation marks and citation omitted).

Plaintiffs say that Kelley had the right to be free from deadly force "when [he] did not pose a (i) significant and (ii) immediate threat of death or serious bodily injury" to O'Malley. (Docket No. 145 at 2). But Plaintiffs' defined right is simply the "general proposition" of *Graham* and *Garner. See Brosseau*, 543 U.S. at 198-99. They needed to define the right at issue using the "specific context of the case" or "situation [the officers] confronted." *See id.* Given the overbreadth of Plaintiffs' definition, the Court will define Kelley's right as of January 31, 2016 in accordance with *Brosseau*.

Mindful of its duty to define Kelley's right at the appropriate level of generality, *Bond*, 142 S. Ct. at 11, the Court defines Kelley's purported right as follows: the

right to be free from being shot seven times from two different officers in the space of a few seconds until falling to the ground, when the officers knew that the victim was holding a knife, repeatedly refused commands to stop walking and drop the knife, and made a forward movement with the knife towards one of the officers who was standing approximately eight feet away.

**. . . Whether the Shooting Violated Kelley's Clearly Established Right**

Based on the Court's definition of the right at issue, it must determine if "clearly established" law, as of January 31, 2016, held that the officers' use of deadly force was objectively unreasonable. *Bond*, 142 S. Ct. at 11-12; *Williams*, 967 F.3d at 259. Put another way, the Court must determine if clearly established law showed that the officers did not have a reasonable fear that Kelley would inflict serious bodily harm on O'Malley when they shot him. *Garner*, 471 U.S. at 3. The Court holds that clearly established law at the time of the shooting did not make the officers' actions unreasonable.

For one thing, Plaintiffs have not identified any precedent factually analogous to the present situation that would show that the officers violated a clearly established right on January 31, 2016. Even more, they have not shown that Fourth Amendment precedent, whether from the Supreme Court, Third Circuit, or elsewhere would put the question "beyond debate." The Court, after careful independent review, has not found any caselaw remotely analogous that would establish the existence of Kelley's right, let alone a right that is "clearly established." *Richardson v. City of Newark*, 820 F. App'x 98, 102 (3d Cir. Aug. 14, 2020) (observing that a police shooting victim "conced[ed] that he cannot cite precedent that is factually on point," and thus the police officer was entitled to qualified immunity); *Bland v. City of Newark*, 900 F.3d 77, 85 (3d Cir. 2018) (holding that police officers were entitled to qualified immunity

"because Bland identifies no caselaw indicating that the
officers violated clearly established law extant in 2011")."

(Appellants' Appendix to Principal Brief pp. 37-39).

Plaintiffs now, apparently conceding that they do not have any particular case
law demonstrating the violation of a clearly established right here, contend that the
shooting of Kelley, Jr., by O'Malley and Rivotti is an "obvious case". Without
significant discussion, Plaintiffs rely on this Court's decision in Russell v.
Richardson, 905 F.3d 239 (3d Cir. 2018), in an attempt to show that O'Malley and
Rivotti clearly could not shoot Kelley, Jr., without violating his constitutional rights.
Such an argument fails.

In Richardson, this Court stated:

> Garner, of course, "lay[s] out excessive-force principles
> at only a general level." White v. Pauly, —— U.S. ——,
> 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam).
> But "general statements of the law are not inherently
> incapable of giving fair and clear warning to officers." Id.
> For this reason, while Garner usually "do[es] not by
> [itself] create clearly established law," it may do so in an
> "obvious case," id., for example, where the
> circumstances reflect "the absence of a serious threat of
> immediate harm to others." Davenport v. Borough of
> Homestead, 870 F.3d 273, 281 (3d Cir. 2017); see also
> Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct. 596,
> 160 L.Ed.2d 583 (2004) (per curiam) ("[I]n an obvious
> case, [Garner's] standard[ ] can 'clearly establish' the
> answer, even without a body of relevant case law.").

905 F.3d at 252.

The Davenport case cited in Richardson states:

*Garner* held that a "police officer may not seize an unarmed, nondangerous suspect by shooting him dead." 471 U.S. at 11, 105 S.Ct. 1694. The Supreme Court, however, has applied *Garner*'s "general" test for excessive force in only the "obvious" case. *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam). And courts have found "obvious" cases only in the absence of a serious threat of immediate harm to others. *See, e.g.*, *Lytle*, 560 F.3d at 417 (finding an obvious case where an officer shot a passenger in a vehicle without a sufficient threat of harm to others); *Adams v. Speers*, 473 F.3d 989, 991–94 (9th Cir. 2007) (finding same where, without a sufficient threat of harm to others, an officer shot a fleeing suspect on the highway and by using deadly force actually created a serious hazard for himself and the suspect); *Smith v. Cupp*, 430 F.3d 766, 773, 776 (6th Cir. 2005) (finding same where, without a sufficient threat of harm to others, an officer shot an intoxicated suspect who took control of a patrol car in a parking lot); *Vaughan*, 343 F.3d at 1331 (finding same where, without a sufficient threat of harm to others, an officer shot suspects who were merely evading arrest).

870 F.3d at 281.

Plaintiffs' attempt to cast this case as an "obvious" violation of Kelley, Jr.'s constitutional rights such that they do not need to demonstrate any controlling law beyond <u>Garner</u> must, therefore, fail.  Here, Kelley, Jr., was armed with a bloody knife, after violently stabbing Police K-9 Aren, demonstrating his willingness to use violence after which he made a forward movement toward O'Malley with extended knife in hand from a distance of approximately eight feet.  Certainly, these facts are distinct from the "obvious case" referenced by Plaintiffs.  Simply put, O'Malley was faced with a serious threat of violence and immediate harm.

50

Given that this is not a situation that falls within the "obvious case" analysis, Plaintiffs needed to direct the District Court – and now this Court – to any case where a police officer faced similar circumstances as O'Malley and Rivotti faced. Plaintiffs have the burden to point to settled law which squarely governs the specific facts of the case at issue.  Plaintiffs have failed to do so.  Accordingly, Plaintiffs have also failed to show that the District Court's qualified immunity analysis was in error.

# CONCLUSION

In conclusion, for all of the above discussed reasons, Defendants O'Malley and Rivotti respectfully request that this Honorable Court affirm the decision of the District Court granting summary judgment in their favor.

Respectfully submitted,

_/s/  Gregory A. Evashavik_
Gregory A. Evashavik, Esq.

_/s/  Nicholas J. Evashavik_
Nicholas J. Evashavik, Esq.

Evashavik Law, LLC
310 Grant Street, Suite 2901
Pittsburgh, PA 15219
Date: _04/26/2023_    *Attorneys for Appellees*

## CERTIFICATION OF BAR MEMBERSHIP

Pursuant to the Third Circuit Local Appellate Rule 46.1(e), we hereby

certify that we are members of the bar of this Court.


_____*/s/  Gregory A. Evashavik*_____
Gregory A. Evashavik, Esq.

_____*/s/  Nicholas J. Evashavik*_____
Nicholas J. Evashavik, Esq.

Evashavik Law, LLC
310 Grant Street, Suite 2901
Pittsburgh, PA 15219

Date:_____04/26/2023_____    *Attorneys for Appellees*

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d) and 32(a)(7)(B) because this brief contains 12,572 words, excluding the parts of the brief exempted by Federal R. App. Proc. 32(f)

1.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

2.      Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic brief is identical to the text in the hard, paper copies of the brief.

3.      Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that a virus detection program was performed on this electronic brief/file using Microsoft Windows Defender Version 4.18.2110.6, and that no virus was detected.

*/s/ Gregory A. Evashavik*
Gregory A. Evashavik, Esq.
*/s/ Nicholas J. Evashavik*
Nicholas J. Evashavik, Esq.
Evashavik Law, LLC
310 Grant Street, Suite 2901
Pittsburgh, PA 15219
*Attorneys for Appellees*

Date:_____04/26/2023_____

# CERTIFICATION OF SERVICE UPON COUNSEL

We hereby certify that on April 26, 2023, we electronically filed the

foregoing using the Court's CM/ECF system, which sent a notification of such

filing to the following:

Noah Geary, Esquire
*(Counsel for Appellants)*

_____/s/ Gregory A. Evashavik_____
Gregory A. Evashavik, Esq.

_____/s/ Nicholas J. Evashavik_____
Nicholas J. Evashavik, Esq.

Evashavik Law, LLC
310 Grant Street, Suite 2901
Pittsburgh, PA 15219
Date:_____04/26/2023_____          *Attorneys for Appellees*