IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1688

CALISIA KELLEY AND JOHNNIE MAE KELLEY, CO-ADMINISTRATRIXS OF THE ESTATE OF BRUCE KELLEY, JR.,

deceased,

Appellants,

vs.

BRIAN O'MALLEY, DOMINIC RIVOTTI in their Individual Capacities as Police Officers for the Allegheny County Port Authority,

Appellees,

_____

Appeal from the Memorandum Opinion and Order dated March 18, 2022 in the United States District Court for the Western District of Pennsylvania at Docket No. 2:17-cv-1599 granting the Appellees' Summary Judgment Motion.

_____

APPELLANTS' REPLY BRIEF.

_____

Submitted by:

Noah Geary, Esquire

Attorney for Appellants

123 Washington Street

Washington, PA 15301

724-222-3788

PA ID 78382

# TABLE OF CONTENTS: APPELLANTS' REPLY BRIEF.

Table of Contents………………………………………………..   1

Table of Authorities………………………………………………   2

Argument…………………………………………………………   3

Conclusion………………………………………………………   23

Certificate of Compliance………………………………………..   24

Certificate of Service……………………………………………   25

# TABLE OF AUTHORITIES:

**Cases:**

Abraham vs. Raso, 183 F.3d 279, 294 (3rd Cir. 1999)………………….   8

Baloga vs. Pittston Area School District, 927 F.3d 742 (3rd Cir. 2019)   6

# Argument.

1. The Appellees wholly failed to address the fact that they have no explanation whatsoever for why, how and when Kelley, Jr. was shot directly in the back, twice. The Autopsy Report identifies these 2 entrance wounds as located in Kelley's right upper back and right mid back:

> <u>Location of entrance wound #1</u>: in the back: right upper back
>
> Direction: back to front and downward
>
> <u>Location of entrance wound #2</u>: in the back: right mid back
>
> Direction: back to front, right to left and upwards.
>
> *(JA 143-144).*

O'Malley, the primary shooter (9 shots fired at Kelley vs. Ravotti's 2 shots), did not even attempt to explain how or who shot Kelley in the back:

> Q. Now, when you were firing at Kelley, he was facing you, correct?
>
> A. Yes.
>
> Q. Okay. Who shot him in the back twice?
>
> A. I don't know.

> Q. Are the only two options you or Officer Ravotti?
>
> A. Yes.
>
> Q. Was it Ravotti?
>
> O'MALLEY: I can't answer that. I don't know.

Ravotti, likewise, offered no explanation:

> Q. Now, the Autopsy Report… indicates that he was shot in the back twice. How would that have happened?
>
> A. I cannot tell you that.
>
> *(JA 415, lines 1-5; 301, lines 2-13).*

About these 2 totally unexplained shots directly to Kelley's back, the lower Court, **in total,** said:

> "That two of the bullets entered
> through the back is immaterial when
> considering the rest of the record."
>
> *(Appendix, Volume I, page 104 ).*

However, the lower Court did not identify what part of the discovery record renders these 2 shots directly to Kelley's back "immaterial". A fact is material if its existence or non-existence might impact the outcome of the suit under the applicable substantive law. <u>Baloga vs. Pittston Area School District</u>, 927 F.3d 742, 752 (3rd Cir. 2019). Because the applicable substantive law here is a test of "reasonableness" to determine whether Appellees' use of deadly force against Kelley was justified, how are the 2 unexplained shots to Kelley's back **immaterial**? A reasonable jury could conclude that these 2 shots to Kelley's back were excessive, unlawful shots. Specifically, a jury could draw the fair inference that Kelley was fully occupied with the 124 pound German Shephard – as the record establishes if it is looked at in the light most favorable to the Kelleys, not the Appellees - and that the Appellees shot Kelley in the back when his back was turned to Appellees while Kelley was fully occupied with the dog. This would be unlawful force: the dog is not a police officer, and the fact that Kelley defended himself against the dog does not mean that he had intentions of violence towards the Appellees. O'Malley claims to have fired 9 times at Kelley while Kelley was facing O'Malley. Malley insists that he fired all shots "within a second". O'Malley mentioned no turning of his body while firing nor that he was in motion while shooting at Kelley. *(JA, 279, 280, 311)*. If true, then it is impossible that Kelley would end up shot in the back – twice. Ravotti claims that he fired his 2 shots at

Kelley while facing Kelley's front and right side. *(JA, 405).* Albeit he testified that maybe the back part of Kelley's back was available to him, there is no entrance wound to Kelley's right flank. Secondly, the entrance wounds to the two shots to the back are 4 and 4 and ½ inches to the right of Kelley's spine. Further, the trajectories of these two shots is back to front and downward and back to front, right to left and upwards. Once again, if true, then it is impossible that Kelley would end up shot in the back – twice. This circumstantial evidence – the 2 unexplained shots to Kelley's back – directly contradict the Appellees' accounts. Did Kelley shoot himself in the back? He was armed only with a Utility knife that had a 6 inch handle and a blade of 1 to 2 inches in length.

     These 2 shots to Kelley's back are: (i) material to the required 'reasonableness' analysis and (ii) circumstantial evidence which directly contradicts -rather than merely "tending to" contradict – the Appellees' stories. The lower Court violated the Summary Judgment Standard of Review by ruling - in essence without any explanation - that the 2 shots to Kelley's back are "immaterial". For their part, the Appellees totally avoided the lower Court's error in their Response Brief. The lower Court not only violated the basic standard of review governing Summary Judgment Motions regarding what is and is not a material fact, it violated this Circuit's cardinal caution in deadly force cases:

> "Because the victim of deadly force is unable to testify, we have recognized that a court ruling on summary judgment in a deadly force case 'should be cautious to ensure that the officer[s] are not taking advantage of the fact that the witness most likely to contradict [their] story – the person shot dead - is unable to testify. Thus, a Court should avoid simply accepting what may be a self-serving account by the officers. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officers story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably".
>
> <u>Abraham vs. Raso</u>, 183 F.3d 279, 294 (3rd Cir. 1999).

Specifically, the lower Court, despite being required to look at circumstantial evidence of record which would clearly tend to discredit the Appellees' story, i.e., the 2 unexplained shots to Kelley's back, removed this circumstantial evidence from its analysis.

Although the lower Court claimed to have examined, closely, the circumstantial evidence of record:

> "The Court remains cognizant of the fact that Kelley could not present his version of events so the Court has closely looked at the circumstantial evidence, that, if believed, would tend to discredit the police officers' story."
>
> (JA, 23).

- the lower Court removed from its analysis these material – and critical - facts.

The lower Court also violated the Summary Judgment Standard of Review in a third way. In analyzing whether a use of force is reasonable, the lower Court had a duty to consider the "totality of the circumstances". By removing entirely from the circumstances of this Homicide the 2 shots to the back, the lower Court, in fact, did **NOT** consider the totality of the circumstances.

The lower Court stated that it:

> "remains keenly aware of its duty to draw all reasonable inferences from the record in favor of the non-moving party".
>
> (JA, 5).

However, it removed material facts from its analysis. How can the Kelley's receive the benefit of fair inferences from facts when favorable, material facts are removed from the Court's entire analysis?

The lower Court committed 3 serious errors here:

1. it mis-defined the 2 unexplained shots to Kelley's back as "immaterial"; **AND**

2. it violated its duty to specifically examine the entire record for circumstantial evidence tending to discredit the officers' story; **AND**

3. it grossly deviated from the required "reasonableness" analysis by not examining the totality of the circumstances.

As to all 3 errors, the Appellees failed to offer a word.

2. The measurements contained in the Measurement Log of the Allegheny County Medical Examiner's Office *(JA, 1627)* establish that O'Malley could not have been in one location when he fired all 9 of his shots at Kelley. The location of his spent shell casings prove O'Malley fired from 2 different locations. It directly contradicts O'Malley's version of events. The Appellees overlooked/ignore the **OME Measurement Log.** *(JA, 1627)*. Instead, they only discuss the OME Map *(JA, 1626)*. On this issue, there is a genuine dispute of material fact as to where the Appellees were when they fired at and killed Kelley.

The Appellees argue at page 36 of their Response Brief that all of the spent shell casings are no more than several feet from Kelley's body and that the scene photographs and the mapping location (*the Inventory Log at JA 1626*) corroborate where Appellees supposedly were when they fired at Kelley.

But this is not true. The Appellees have ignored the measurements from the OME Measurement Log which accompanied the OME map *(JA 1627 Log, 1626, Map)*. The measurements in the OME Measurement Log *(JA, 1627)* show that O'Malley was in one location when he fired shots AA, N, P, W, X, Y and Z and a second, different location when O'Malley fired shots B and C. Specifically, the location of spent shell casings AA, N, P, W X, Y and Z show an ejection pattern consistent with firing from one location. Shell casings B and C, however - taking into account O'Malley's contention that he fired all 9 shots "within a second" from

11

one location - are too far apart from shell casings AA, N, P, W, X, Y and Z to be fired from the same location as AA, N, P, W, X, Y, Z.

The distance between spent casing AA and spent casing B, using the OME's own Measurement Log *(JA, 1627),* is 19.8 feet. If O'Malley fired all 9 of his shots from **one** location, in the same direction, "within a second", bullet casings AA and B would not be **19.8 feet apart**. It is impossible. This shooting occurred in a grass yard. No bouncing or rolling of bullet casings could have occurred, which sometimes accounts for casings fired from one location to be very far apart. A reasonable jury could draw the inference that O'Malley actually fired at Kelley from 2 different locations from the fact that casing AA and casing B were 19.8 feet apart.

The log establishes, using a Utility Pole as the OME's reference point, that:

-Casing AA was **109 feet**, four inches (rounded to 109 feet) West of the Utility Pole.

-Casing B was **94 feet, 11 inches** (rounded at 94 feet) West of the Utility Pole.

-Casing AA was **16 feet, 2 inches** (rounded to 16 feet) South of the Utility Pole.

-Casing B was **3 feet, 3 inches** (rounded to 3 feet) South of the Utility Pole.

Without factoring in the distance between casing AA and casing B as to being South of the reference point/Pole, the distance between AA, **109 feet** West of the Pole and B, **94 feet** West of the Pole, is **15 feet (109 feet – 94 feet = 15 feet).** Factoring in the distance between casing AA and casing B with the South aspect/coordinate from the Utility Pole, the distance between spent casing AA and B is **19.8 feet.** Because the distance West between casings AA and B and the distance South between casings AA and B form a right angle, the length between AA and B, i.e., the hypotenuse, is arrived at by taking the square root of the sum of the differences in distance between the West and South measurements, squared.

    A reasonable jury, therefore, upon consideration of the Measurement Log in conjunction with the Map/Diagram -rather than looking at the Map/Diagram in isolation – could fairly infer that O'Malley, contrary to his testimony, was in 2 different locations when he fired shots at Kelley.

    The Appellees invoke and vouch for the reliability of the OME's Map. They failed, however, to factor in the corresponding measurements. The measurements, specifically the distance in feet between the spent shell casings -particularly casings AA and B - materially contradict O'Malley's version that he fired all 9 of his shots from one location, "within a second". Accordingly, a genuine dispute of material fact exists as to where O'Malley was when he fired at Kelley.

Secondly, and very significantly, casings B and C would correspond precisely with the 2 shots to Kelley's back – which neither O'Malley nor Ravotti have, self-servingly, any explanation for.

3.      The Appellees, throughout their Response Brief, continue to ignore the standard of review requiring that facts be looked at in the light most favorable to the Kelleys, not the Appellees, and that it is the Kelleys who are entitled to the benefit of all reasonable factual inferences – not the Appellees.

The Appellees argue that Kelley "assaulted" an Officer at the Gazebo. In fact, the content of the entire Radio Communications by and between all of the responding officers on scene, 22 officers in number – is merely that Kelley was "armed" with a knife. (*Appellees' Exhibit, DCD No. 120-1 at Q*). There is no mention of an assault on any officer at the Gazebo. An assault by Kelley on a police officer, if it actually happened, would be a significant enough event for any/every officer to communicate this to other officers via radio. Such an occurrence is not anywhere on the Radio Communications. Therefore, looking at the record facts in a light most favorable to the Kelleys, Kelley assaulted no one.

The Appellees argue that Kelley tried to stab or slash Officer Adams at the Gazebo. Nowhere in the entire Radio Communications by and between all 22 officers was such a thing memorialized by any officer, ever. This is also serious enough for Adams, in particular, if it actually happened, to have memorialized via radio communications.

The Appellees continuously argue that Kelley "slashed" his Utility Knife, with the 1 to 2 inch blade, at various points in time during the 18 minute walk before he was shot to death by Appellees. Such a violent, menacing gesture, if it actually ever happened, would very, very likely have been mentioned by at least 1 of the 22 officers on scene. Nowhere in the Radio Communications does it exist. If Kelley did this numerous times, it is even more significant/threatening. There is no mention of any such thing. Therefore, looking at the facts in the light most favorable to the Kelley family:

>  Kelley assaulted no one;
>
> Kelley did not try to stab Officer Adams;
>
> Kelley never slashed his knife at any officer (excepting the one interaction with Officer Kynroe Sanders, covered squarely in Appellants' Principal Brief, wherein Kelley merely pointed his Utility Knife at Saunders momentarily and said: "Don't you do it! Don't you sneak up on me!!).

**Therefore, all Kelley did was fail to put down his knife.** This was frustrating to the officers, to be sure. But this did not necessitate killing him. On this point, Kelley's long-standing diagnosis of paranoid schizophrenia is undisputed. And in light of Officer Hahn's testimony, a genuine dispute of material

fact exists whether Kelley exhibited signs of mental illness. Obviously, mental health issues impair a person's ability to comply with a police command - to put the utility knife down. But the Appellees and the lower Court never attribute Kelley's failure to put the knife down to mental illness rather than defiance. This would require compliance with the standard of review that these facts be viewed in the light most favorable to the Kelleys.

The lower Court also faulted Kelley for not putting the knife down once attacked by the 124 lb dog. But being attacked by a 124 lb German Shephard would invoke a "fight or flight" response and impair any person's ability to comply. Yet at no time do the Appellees nor did the lower Court look at the fact that Kelley was defending himself against an attack by O'Malley's K-9 Partner in the light most favorable to the Kelley family.

Contrary to the arguments of the Appellees, the lower Court violated the standard of review by consistently and disturbingly viewing the record facts in this tragic case in the light most favorable to the Officers- not the Kelley family.

**Conclusion.**

Because the lower Court clearly committed serious errors in its analysis, its grant of Summary Judgment on the basis of qualified immunity as a matter of law must be reversed.

**WHEREFORE,** Johnnie Mae Kelley, the Mother of Bruce Kelley, Jr. and his sister, Calisia Kelley, respectfully request this Honorable Court to **REVERSE** the lower Court's grant of Summary Judgment and to remand for a jury trial in this matter.

Respectfully submitted,

Date: May 17, 2023

/s/ Noah Geary
Noah Geary, Esquire
Attorney for Appellants
123 Washington Street
Washington, PA 15301
724 222-3788

## CERTIFICATE OF COMPLIANCE:

1.  I, Noah Geary, Esquire, counsel for the Appellant, hereby certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit, having been duly admitted by written motion on November 20, 2000.

2.  This brief complies with the type-volume limitation of Federal Rule

    of Appellate Procedure 32(a)(7)(B) because this Reply Brief contains no more than 6,500 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(6) because this Brief has been prepared in a proportional typeface using a MicrosoftWorks Word Processor using Times New Roman at 14 point.

3.  I, Noah Geary, Esquire, do hereby certify that two copies of Appellants' Reply Brief were served upon opposing counsel of record.

4.  I, Noah Geary, Esquire, hereby certify that the text of the foregoing e-filed Brief and hard copies of the Brief are identical.

5.  I also certify that a virus check was performed on Appellee's e-brief (PDF File) using AVG Anti-Virus Software.

                                        Respectfully submitted,


                                        s/ Noah Geary, Esquire
                                        Noah Geary, Esquire

# CERTIFICATE OF SERVICE:

I, Noah Geary, hereby certify that I served the foregoing **APPELLANTS' REPLY BRIEF** upon the following counsel of record via ecf-filing this day:

*Counsel for Appellees:*
Greg Evashavik, Esquire
Suite 1801 Grant Building
Pittsburgh, PA 15219
412-261-2813

Date: May 17, 2023                    /s/ Noah Geary
                                       Noah Geary, Esquire
                                       Attorney for Appellants
                                       123 Washington Street
                                       Washington, PA 15301
                                       724 222-3788