## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

### No. 22-1688

### CALISIA KELLEY AND JOHNNIE MAE KELLEY, CO-ADMINISTRATRIXS OF THE ESTATE OF BRUCE KELLEY, JR., DECEASED,

**Appellants,**

**vs.**

### BRIAN O'MALLEY and DOMINIC RIVOTTI, in their Individual Capacities as Police Officers for the Allegheny County Port Authority,

**Appellees**

**Appeal from the Memorandum Opinion and Order dated March 18, 2022 in the United States District Court for the Western District of Pennsylvania at Docket No. 2:17-cv-1599 granting the Appellees' Summary Judgment Motion.**

### PETITION FOR REHEARING EN BANC AND PETITION FOR PANEL REHEARING from DECEMBER 22, 2023 PANEL OPINION AFFIRMING GRANT OF SUMMARY JUDGMENT ON BASIS OF QUALIFIED IMMUNITY.

Submitted by:

**Noah Geary, Esquire**
**Attorney for Appellants**
**123 Washington Street**
**Washington, PA 15301**
**724-222-3788**

## **CRITERIA FOR REHEARING EN BANC:**

I, Noah Geary, Esquire, express a belief, based upon a reasoned and studied professional judgment, that the Panel decision under review directly conflicts with the United States Supreme Court decisions of <u>Kisela vs. Hughes</u>, 138 S.Ct. 1148, <u>Spady vs. Bethlehem School District,</u> 800 F.3d 633 (3rd Cir. 2015) and <u>Bennett vs. Murphy</u>, 274 F.3d 133 (3rd Cir. 2002) by improperly conducting a 'clearly-established' law analysis despite the existence of genuine disputes of material fact. Secondly, the decision improperly removes the requirement to justify the use of deadly force, i.e., that the actor/circumstances pose a significant and immediate threat of death or serious bodily injury to human life - to the officer or another. Therefore, the Panel decision conflicts with <u>Tennessee vs. Garner</u>, 417 U.S 1 (1985) and <u>Graham vs. Connor</u>, 490 U.S. 386 (1989), and consideration by the full court is necessary to secure and maintain uniformity of the court's decisions. The decision also violated the Law of the Case Doctrine and is contrary to the Opinion of this Court dated September 24, 2019 at Docket No. 18-3283 (Chagares, Jordan, Restrepo). The 2019 Panel reversed the district court's grant of the Appellees' Rule 12 Motion. *(Exhibit #4)*. The decision under review conceded that the Law of Case Doctrine governs a key issue in this case. Therefore, the 2023 Panel decision conflicts with a decision of this Court and consideration by the full court is therefore necessary to secure and maintain uniformity of the court's decisions.

This statement is intended to comply with **Local Rule of Appellate Procedure 35.1.**

Respectfully submitted,

/s/ Noah Geary
Noah Geary, Esquire


### CRITERIA FOR PANEL REHEARING:

I, Noah Geary, Esquire, hereby express a belief that the Panel's decision overlooked and misapprehended material facts and points of law which warrants Rehearing. This statement is intended to comply with **Rule 40(a)(2) of Appellate Procedure.**

Respectfully submitted,

/s/ Noah Geary
Noah Geary, Esquire

<u>Procedural History.</u>

This is a deadly force case. On September 24, 2019 at Docket No. 18-3283 a Panel of this Court, reversed the lower Court's grant of the Appellees' Rule 12 Motion on the basis of qualified immunity.

The district court granted the Appellees Motion for Summary Judgment on the basis of qualified immunity. The Appellants appealed.

On December 22, 2023, a Panel of this Court *(See Opinion, Exhibit #1)* affirmed the lower Court's grant of Summary Judgment.

Facts.

This is a deadly force case. Plaintiff's deceased, Bruce Kelley, Jr., age 34, was in a Gazebo with his Father, Bruce Kelley, Sr. Two Officers (not the Appellees) started to walk towards them. The Kelleys were drinking beer. Before the officers got to the Gazebo, Kelley, Jr. attempted to de-escalate any situation by walking towards a garbage can and throwing his beer away. (*JA 565*). The Officers allege that Kelley, Sr. approached and punched Officer Hampy. As Adams assisted with Kelley Sr., Kelley, Jr. began "hugging the gazebo." (*JA 449-450*). Adams and Hampy began to strike Kelley's hands so that he would let go of the Gazebo. In response, Kelley pulled out a utility knife, described as having a blade "coming out an inch or two". *(JA 462, 5-14*). Kelley walked away from the officers. Back-up was summoned.  22 Officers responded.  Kelley, Sr. was taken into custody. For the next 18 minutes, Kelley, Jr. walked away from all of the officers. They shouted verbal commands for him to drop his knife. He did not. He continued walking away from the Officers through the neighborhood. At no time did he approach any civilians. Officers attempted OC deployments. These were unsuccessful because officers got the spray in their own eyes, faulting a breeze. Two Taser deployments were attempted, but Kelley's clothing was too thick.

Appellee O'Malley was a K-9 Officer. He had his K-9 Partner, a 124 lb. German Shephard, with him. O'Malley was not part of the foot pursuit of Kelley.

Instead, O'Malley anticipated from radio broadcasts that Kelley was coming in his direction, and hoped to intercept him with the K-9. But instead of revealing the dog to Kelley, O'Malley concealed himself and the dog behind bushes. As Kelley was walking away from O'Malley and all other officers, O'Malley released the dog to do a "bite and hold" apprehension of Kelley. The dog ran at Kelley while Kelley's back was to the dog. The dog bit the back left tricep/shoulder area of Kelley. Kelley, with the Utility knife in his right hand, started to slash at the dog. Appellees O'Malley and Ravotti started shooting Kelley. The dog ran away from Kelley towards the Officers. The dog was wounded and died later that day.

O'Malley, the K-9 Officer, shot at Kelley 11 times. O'Malley fired first. He contends that Kelley was facing him as he fired. O'Malley claims that he fired all 11 shots "within a second" and that O'Malley was stationary while he fired all of his shots. Appellee Ravotti was standing in front and to the side of Kelley. After O'Malley started shooting at Kelley, Ravotti joined in, shooting at Kelley twice.

Kelley's autopsy report establishes that Kelley was shot twice in the back. A third shot went through his neck, and vertically down his torso. Six other shots entered Kelley's chest.

Argument.

Rehearing is warranted in this deadly force case because the Panel

overlooked specific facts necessary to conduct an appropriate 'clearly-established'

law analysis. The Panel also misstated record evidence critical to its articulation of

the 4th Amendment Right at issue. The Panel also repeatedly failed to look at the

evidence in the light most favorable to Kelley.

The Panel clearly violated the dictates of Brosseau vs. Haugen, 543 U.S 194

(2004) by improperly straining to create a "specific factual context" from which to

identify whether a clearly-established right was involved.

In Brosseau vs. Haugen, the Supreme Court explicitly directed that judges

**not try** to answer the question of qualified immunity as a matter of law –

especially when inherent, intrinsic factual disputes must be made first:

> The question here of the Defendants entitlement
> to qualified immunity is a quintessentially "fact-specific"
> question, **not a question that judges should try to
> answer "as a matter of law".** Citing Anderson, 483
> U.S. at 641. Although it is preferable to resolve the
> qualified immunity question at the earliest possible stage of the
> litigation, **this preference does not give judges
> license to take inherently factual questions away
> from the jury.**

Brosseau vs. Haugen, at 206. (**Emphasis added).**

<u>Analysis of the Panels' varying articulations of the 4th Amendment Right at</u>

<u>issue.</u>

On what the Panel represented as undisputed facts, it initially defined the

clearly-established right at issue as the right to be free from deadly force after a

suspect:

1.    refuses commands;

2.    kills a police K-9 with a knife;

3.    after previously injuring another officer;

4.    while being within eight feet of an officer with knife still in hand;

5.    after fending off several non-lethal attempts at capture; and

6.    after having pointed a knife at an approaching officer earlier in the encounter.

*(Opinion at 7).*

Starting with #3, the Panel significantly erred by attributing alleged conduct

of **Bruce Kelley, Senior** to **Bruce Kelley, Junior.**

The Panel recited the alleged "fact" that Kelley, **Jr.** previously injured

another officer as follows:

When one officer tried to restrain Kelley, Kelley resisted, and a struggle
ensued. During the tussle, Kelley injured the second officer, causing
"possibly a mild concussion". App. 6."

*Opinion, at 2.*

This is error. It was Bruce Kelley, **Sr.** who allegedly struck Officer Hampy – not

Bruce Kelley, **Jr..**  The Joint Appendix at JA 691 explicitly refers to the Appellees'

own CSUMF, #13, which averred that it was **Sr.** who allegedly punched Hampy –

not Bruce Kelley, **Jr.:**

> **Kelley Sr.** rushed Hampy and punched her in the face, giving her a
> concussion".

The actual source of this information in the discovery record is *JA 565*, an

interview of Hampy.

Significantly, the Panel then erroneously attributed this alleged conduct of

**Kelley, Sr. to Kelley, Jr.** as a fact to justify the use of deadly force against Kelley,

Jr:

> [Kelley], after previously injuring a police Officer…

*(Opinion at 7);* and again at Page 10:

> Kelley, by contrast…who physically harmed an officer".

The Panel misstated another fact, fact #2, above, that Kelley, Jr. had "killed"

the K-9. But this is not true: O'Malley admitted that at most, at the point the

Appellees started shooting him, Kelley had only wounded the dog. Ravotti did not

even know that the dog had been wounded. *(JA 305, 426)*. The Panel relied upon

this second misstatement of fact to justify its conclusion that killing Kelley was not

prohibited by clearly-established law *(Opinion, at 7)*.

As to refusing commands, this is not an indication that Kelley had the intent to harm any of the officers. In conjunction, nowhere in the Panel's Facts is the bedrock requirement to justify the Appellees use of deadly force:  the existence of a significant and immediate threat of death or serious bodily injury to a human officer or other human being.

The Panel's Fact #6 is that Kelley pointed a knife at an approaching officer earlier in the encounter. It is true that Kelley momentarily pointed his knife at Officer Sanders and said: "Don't you do it!!! Don't you sneak up on me!!!" *(JA 1040, lines 8-12)* when Saunders tried to strike Kelley on the wrist with his ASP. This was not a threat of violence. Also, Kelley immediately turned *away* from Saunders and continued walking *in the opposite direction* of all of the officers.

Secondly, O'Malley was not present for this due to being in another area. O'Malley did not see this. So that this momentary interaction between Kelley and Saunders occurred cannot be justification for O'Malley to kill Kelley. The pertinent question is what did O'Malley know when he started shooting at Kelley.

Third, and as it relates to Appellee Ravotti who was present at that interaction, the law is clear that "Force justified at the beginning of an encounter is not justified even seconds later if the justification or the initial force has been eliminated". <u>Lamont vs. New Jersey</u>, 637 F.3d 177, 184 (3rd Cir. 2011) citing <u>Abraham vs. Raso</u>, 183 F.3d 279, 184 "A passing risk to a police officer is not an

10

ongoing license to kill an otherwise unthreatening suspect"; "When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity".

The Panel's 5th Fact justifying killing Kelley was that Kelley had fended off non-lethal attempts at capture. It is true that officers deployed pepper spray at Kelley. However, they got the spray in their own eyes due to no fault of Kelley. This deployment, importantly, did not provoke aggression from Kelley. He simply continued walking away. Other officers Tased Kelley, but due to the thickness of his clothing, the prongs did not puncture his skin, rendering these deployments unsuccessful. Likewise, these deployments provoked no aggression from Kelley.

Thus, "fending off" prior uses of force in no way justified killing Kelley.

The final fact which Panel relied on to justify killing Kelley was that after he defended himself against the 124 lb. German Shephard, Kelley was within eight feet of an officer with the knife still in his hand. There is a genuine dispute of material fact as to the distance which existed. Even if true, there is a total absence of evidence of a significant and immediate threat of death or serious bodily injury to any of the human officers, including the Appellees. This is the crux of a 4th Amendment seizure analysis. Yet it is nowhere in the Panel's reasoning.

<u>The Panel's second articulation of the right involved.</u>

The Panel articulated the purported clearly-established constitutional right a second time. It was whether Kelley had the right to be free from deadly force after he:

1.    refused commands;

2.    killed the K-9 with a knife; and

3.    was within eight feet of an officer with knife in hand.

*(Opinion, Page 8, Footnote 4).*

As addressed in the above section, none of these facts, even if true, justified killing Kelley.

<u>The Panel's third articulation.</u>

In yet another portion of their Opinion, the Panel defined the purported right here as the right to be free from deadly force after a suspect:

1.    holds a knife near officers;

2.    refused commands to drop the knife; and

3.    violently stabbed a police dog who was trying to apprehend him.

*(Opinion, Page 7, Footnote 3).*

Facts 1 and 2 above have been addressed. The Kelleys' position on the characterization that Kelley violently stabbed a police dog is as follows.

First, this characterization violates the Standard of Review requirement that the Panel view the facts in the light most favorable to Kelley. When this fact is actually viewed in the light most favorable to Kelley, he was defending himself against a sneak attack by a 124 lb. attack dog. The Panel likewise failed to look at O'Malley's deployment of the K-9 in the light most favorable to Kelley. A reasonable jury could find that it was not only unreasonable, but reckless.

The moment O'Malley deployed his K-9 partner, Kelley was walking away from all officers. Kelley's back was to them. No civilians were in the area. At that moment, Kelley posed a threat to no one. *(JA 396, 400; line 5 into next page line 4; ALSO, line 23).* The dog weighed 124 pounds. *(JA 203, JA 1606).*   O'Malley made the deliberate choice to conceal himself and the dog from Kelley behind bushes. *(JA 494, lines 2-14).* This is despite the fact that O'Malley knew from experience as a K-9 Officer that suspects are likely to surrender merely upon seeing/viewing the 124 pound German Shephard. *(JA 231, lines 1-7). Mere presence* of an officer - or a 124 lb German Shephard -can gain compliance from a suspect. O'Malley, however, made the deliberate choice to not show the dog to Kelley. Instead, he conducted a sneak attack which put the dog at risk.

> I was kind of glad because I knew he didn't –
> he was walking but he didn't, like, see which
> directed my partner was coming from. That's
> where I kind of felt I sort of had a nice takedown
> because he was going to be surprised.

*(JA 496).*

A reasonable jury could find concealing the dog from Kelley was not only

unreasonable, but reckless. Displaying the dog would have placed no one in danger

- especially the dog. O'Malley knew Kelley had a Utility knife with a 2 inch blade.

It was certainly foreseeable that Kelley would use the knife to defend himself.

Looking at this use of force in the light most favorable to Kelley, the deployment

was reckless because O'Malley knew Kelley would likely use the knife on the dog.

It was then untenable for O'Malley to rely on Kelley's predictable reaction to the

dog attack as the excuse to kill Kelley.

The required "totality of the circumstances" analysis -which the Panel

deviated from, requires an accounting of whether the officer's own reckless or

deliberate conduct unreasonably created the need to use deadly force. <u>Johnson vs.

City of Philadelphia</u>, 837 F.3d 343, 351 (3rd Cir. 2016).

Also, any competent officer in O'Malley's shoes would know that Kelley

would defend himself against the attack. This would involuntarily invoke a "fight

or flight" response in Kelley which would immediately impair any suspect's ability

to comply. The law makes clear that qualified immunity does not protect an officer

who acts in a plainly incompetent manner:

> A defendant officer will not be immune if, on an
> objective basis, it is obvious that no reasonably competent
>  officer would have concluded that [a warrant should issue].

Reedy vs. Evanson, 615 F.3d 197, 224 (3rd Cir. 2010)

A reasonable jury could conclude that O'Malley's deployment of his K-9 partner

was unreasonable, reckless, and plainly incompetent.

### The Panel overlooked 3 other material facts.

### The Panel failed to consider the 2 unexplained shots to Kelley's back.

O'Malley claims that he fired all of his shots while facing Kelley as Kelley

was facing him. O'Malley claims that he fired from one stationary position,

"within a second".  *(JA 286, lines 15-19; 311, lines 14-25)*. Ravotti fired two shots

while Kelley was in front of Ravotti and to Ravotti's side. *(JA, 529 line 8)*.

Significantly, Kelley's Autopsy Report directly contradicts the Officers'

versions. It establishes that Appellees shot Kelley directly in the back, twice:

**Location of entrance wound #1: in the back: right upper back**

**Direction: back to front and downward**

**Location of entrance wound #2: in the back: right mid back**

**Direction: back to front, right to left and upwards.**

*(JA 35-37)*.

Incredibly, neither Officer has/had any explanation as to:

(1)    who shot Kelley in the back, OR

(2)    how the shooting of Kelley in the back – twice – occurred:

*(JA 415, 1-5; 301, 2-13).*

This Forensic Evidence/Physical evidence which directly contradicts the Appellees' version, **alone**, clearly constitutes a genuine dispute of material fact compelling that Rehearing be granted.

A reasonable jury could infer that the Appellees' complete lack of any explanation for shooting Kelley twice in the back is because the Appellees are lying. Inherent in this disputed material fact is the obvious need for a credibility determination to be made by a jury.

### Regarding the 2 unexplained shots to Kelley's back, the Panel violated this Circuit's cardinal caution in deadly force cases.

Significantly, the Panel violated this Circuit's cardinal caution governing deadly force cases: Courts are explicitly cautioned not to accept the Officers' self-serving accounts of what transpired when they have killed the only other witness to what happened, here, Bruce Kelley, Jr.. Abraham vs. Raso, 183 F.3d 279, 294 (3rd Cir. 1999):

> Because the victim of deadly force is unable to testify, we have recognized that a court ruling on summary judgment in a deadly force case 'should be cautious to ensure that the officer[s] are not taking advantage of the fact that the witness most likely to contradict [their] story – the person shot dead -  is unable to testify. Thus, a Court should avoid simply accepting what may be a self-serving account by the officers. **It must also look at the**

> **circumstantial evidence that, if believed, would tend to discredit the police officers story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.**

**(Emphasis added).**

The Panel violated its duty under <u>Abraham vs. Raso</u> to look for evidence in the record which would tend to discredit the Appellees' version. The "if believed" component of this caution to lower courts is the obvious emphasis that credibility determinations are for the necessary and exclusive province of a jury.

Notably, the <u>Raso</u> Court  referenced Autopsy Report findings which disproved the danger which the Defendant Officer claimed to have been in:

> Based on this physical evidence, a jury could reasonably decide to reject the security officers testimony. Considering the physical evidence together with the inconsistencies in the officer's testimony, a jury will have to make credibility judgments, and credibility judgments should not be made on Summary Judgment.

Based on the Autopsy findings, the <u>Raso</u> Court reversed the grant of Summary Judgment on the basis of qualified immunity and remanded for a jury trial.

Accordingly, <u>Raso</u> should compel the identical result as to the overlooked Kelley Autopsy Findings.

<u>The Panel overlooked 2 Officer eyewitness accounts which directly contradicted
the Appellees' version.</u>

**<u>Officer Hahn's eyewitness account of the shooting of Kelley.</u>**

Eyewitness Officer Hahn testified:

> **I just heard the gunfire, and I saw the guy with the – the bad guy with
> the dog in the air.**

*(JA,  1239 -1242).*

**<u>Officer Granger's eyewitness account of the shooting of Kelley.</u>**

Eyewitness Officer Granger testified:

> **…when the dog was stabbed, shots were fired**.

*(JA, 1180, 1184 - 1189).*

These 2 eyewitness accounts directly contradict the Appellees' version of the

shooting that they only began to fire after the K-9 had disengaged from Kelley and

walked away. (*JA 272-83; 404-04*).  Additionally, <u>Tennessee vs. Garner</u>, 471 U.S.

1, 11-12 holds that in a deadly force case, if feasible, some warning should/must be

given to the suspect. Here, neither Appellee provided any warning to Kelley before

shooting him to death. A warning to Kelley, on this record, was feasible.

<u>The Panel overlooked Forensic evidence which supports a conclusion that
O'Malley fired at Kelley from 2 different locations, directly contradicting
O'Malley's story that he fired from one location, standing stationary.</u>

The measurements contained in the Measurement Log of the Medical
Examiner's Office *(JA, 1627)* support a finding that O'Malley could not have been
in one location when he fired all of his shots at Kelley. The location of nine spent
shell casings, all marked "FC" are evidence that O'Malley fired from two different
locations. This totally contradicts O'Malley's version. The measurements *(JA,
1627)* show that O'Malley was in one location when he fired shots AA, N, P, W,
X, Y and Z and a second, different location when O'Malley fired shots B and C.
Specifically, the location of spent shell casings AA, N, P, W X, Y and Z show an
ejection pattern consistent with firing from one location. Shell casings B and C,
however - taking into account O'Malley's contention that he fired all 9 shots
"within a second" from one location - are too far apart from shell casings AA, N,
P, W, X, Y and Z to be fired from the same location as AA, N, P, W, X, Y, Z.

The distance between spent casing AA and spent casing B, *(JA, 1627),* is
19.6 feet. If O'Malley fired all of his shots from **one** location,  "within a second",
casings AA and B would not be **19.6 feet apart**. It is impossible. This is
particularly true because the shooting occurred in a grass yard. No bouncing or
rolling of bullet casings could have occurred, which sometimes accounts for

casings fired from one location to be very far apart. A jury could draw the fair

inference that O'Malley actually fired at Kelley from 2 different locations. This

totally contradicts his entire account.

Significantly, casings B and C could also correspond precisely with the 2

shots to Kelley's back – which neither O'Malley nor Ravotti have any explanation

for.

## The Panel violated the Law of the Case.

The Panel violated the Law of the Case regarding a critical fact/conclusion

determined by the Rule 12 Panel. The Rule 12 Panel reversed the lower Court's

initial grant of qualified immunity. The factual allegations relied upon by the Rule

12 Panel were borne out in discovery, so the Panel's finding constituted the law of

the case. This was conceded in the decision under review. *(Opinion under review,*

*Page 8, Footnote 3 "...and that is the law of the case")*. The Rule 12 Panel

analyzed the totality of the circumstances and ruled that Kelley posed little

immediate threat to the safety of the Officers or anyone else. *(Opinion, Page 6,*

*first full paragraph, Page 7, second full paragraph).* The Panel in the ruling under

review contravened that finding.

**WHEREFORE,** Johnnie Mae Kelley and Calisia Kelley, respectfully request this Honorable Court to **GRANT** Rehearing and upon review, to **REVERSE** the Court's grant of Summary Judgment and remand for a jury trial in this matter.

Respectfully submitted,

Date: January 19, 2024

/s/ Noah Geary
Noah Geary, Esquire
Attorney for Appellants
123 Washington Street
Washington, PA 15301

**CERTIFICATE OF COMPLIANCE:**

1.   I, Noah Geary, Esquire, counsel for the Appellant, hereby certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit, having been duly admitted by written motion on November 20, 2000.

2.   This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 35 (2)(B) because this **PETITION FOR HEARING EN BANC and PANEL REHEARING** contains no more than 3,900 words and does not exceed 15 pages. This PETITION complies with the typeface requirements of Federal Rule of Appellate Procedure 35 because this Brief has been prepared in a proportional typeface using a MicrosoftWorks Word Processor using Times New Roman at 14 point.

3.   I, Noah Geary, Esquire, do hereby certify that two copies of Appellants' **PETITION FOR REHEARING** were served upon opposing counsel of record.

4.   I, Noah Geary, Esquire, hereby certify that the text of the foregoing e-filed Brief and hard copies of the Brief are identical.

5.   I also certify that a virus check was performed on Appellee's e-brief (PDF File) using AVG Anti-Virus Software.

Respectfully submitted,

s/ Noah Geary, Esquire
Noah Geary, Esquire

**CERTIFICATE OF SERVICE:**

I, Noah Geary, hereby certify that I served the foregoing **APPELLANTS'**

**PETITION FOR REHEARING** upon the following via ecf-filing this day:

*Counsel for Appellees:*
Greg Evashavik, Esquire

Date: January 19, 2024                    /s/ Noah Geary

                                          Noah Geary, Esquire
                                          Attorney for Appellants